Michael K. Friedland (SBN 157,217)
Michael.Friedland@knobbe.com
Lauren Keller Katzenellenbogen (SBN 223,370)
Lauren.keller@knobbe.com
Jason A. Champion (SBN 259,207)
Jason.Champion@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff
Pacific Packaging Concepts, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PACIFIC PACKAGING CONCEPTS, INC., | Civil Action No. 2:19-cv-04755-ODW-Ex |
| Plaintiff, | **OPPOSITION TO NUTRISYSTEM'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| NUTRISYSTEM, INC., NUTRI/SYSTEM IPHC, INC., | **Hearing; Feb. 22, 2021** <br> **Time: 1:30 pm** <br> **Ctrm: 5D** |
| Defendants. | **Final Pretrial Conf.: March 22, 2021** <br> **Trial Date: April 20, 2021** |
| | **Hon. Judge Otis D. Wright II** |

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**TABLE OF CONTENTS**

Page No.

I. INTRODUCTION ................................................................................1

II. FACTUAL BACKGROUND .............................................................2

    A. Fresh Start Vitamin Co.'s FRESH START Mark ........................2

    B. Nutrisystem's Use of FRESH START .........................................4

    C. Nutrisystem's Infringement Has Harmed Fresh Start ..................5

III. LEGAL STANDARD ..........................................................................6

IV. A REASONABLE ROYALTY IS AN APPROPRIATE
MEASURE OF FRESH START'S DAMAGES ...................................7

    A. Courts Regularly Award a Reasonable Royalty as a
Measure of Damages in Trademark Actions ...................................7

    B. The Ninth Circuit Does Not Require Intent to License to
Obtain a Reasonable Royalty .........................................................8

    C. A Reasonable Royalty Can Be Determined Here Based
on Nutrisystem's Valuation of its Marks and Rates
Others Have Paid to Use Similar Marks .......................................11

    D. Fresh Start has Never Entered into Any Royalty-Free
Coexistence Agreement for the FRESH START Mark or
Any Similar Mark ..........................................................................13

    E. Nutrisystem Has Not Shown That Any Other Parties Use
the Mark "Fresh Start" for Dietary Supplements or
Related Products ............................................................................14

V. FRESH START MAY SEEK DISGORGEMENT OF
PROFITS FOR INFRINGEMENT BASED ON REVERSE
CONFUSION ....................................................................................16

    A. Fresh Start Claims Both Forward And Reverse Confusion..........16

    B. Disgorgement of Profits Has Long Been a Remedy for
Infringement Based On Reverse Confusion .................................17

    C. Fresh Start is Not Seeking a Windfall .........................................18

    D. *Lindy Pen's* Requirement That a Defendant Intentionally
Trade On the Trademark Owner's Goodwill is No
Longer Good Law ..........................................................................20

**TABLE OF CONTENTS**
*(cont'd)*

Page No.

E.   Willfulness is Not Required for Disgorgement of Profits Post-*Romag* ..................................................................21

F.   Nutrisystem's Infringement of Fresh Start's FRESH START Trademark Rights Was Willful ........................................21

G.   Nutri/System IPHC Is a Proper Party to this Lawsuit ..................24

VI.   CONCLUSION .........................................................................25

**TABLE OF AUTHORITIES**

Page No(s).

*Active Sports Lifestyle USA LLC v. Old Navy, LLC*,
   No. SACV1200572JVS (Ex), 2013 WL 11239385
   (C.D. Cal. Nov. 21, 2013) ................................................................. 11

*Airhawk Int'l, LLC v. Ontel Products Corp.*,
   Case No. 18-cv-00073-MMA-AGS, 2020 WL 2306440
   (S.D. Cal. May 8, 2020) .................................................................. 21

*Am., Inc. v. Payless Shoesource, Inc.*,
   No. 01 Civ. 1655, 2008 WL 4279812 (D.Or. Sept.12, 2008).................. 8, 10

*Amicus Communications, L.P. v. Hewlett-Packard Co.*,
   Case No. Civ.A. SA-98-CA1176PM, 2000 WL 33348186
   (W.D. Tex. Jan. 10, 2000) ................................................................ 18

*Boeing Company v. KB Yuzhnoye*,
   Case No. CV-13-00730-AB, 2015 WL 12803452
   (C.D. Cal. Nov. 3, 2015) .................................................................. 24

*Branding v. By Lee Tillett, Inc.*,
   940 F. Supp. 2d 1178 (C.D. Cal. 2013)............................................. 16

*Brennan's Inc. v. Dickie Brennan & Co. Inc.*,
   376 F.3d 356 (5th Cir. 2004).......................................................... 14

*Buc-ee's Ltd. v. BUCKS, Inc.*,
   Case No. 8:17CV287, 2018 WL 818312 (D. Neb. Feb. 9, 2018)................ 14

*Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.*,
   606 F.Supp.2d 571 (M.D.N.C.2009)................................................. 8

*BuzzBalls, L.L.C. v. BuzzBox Beverages, Inc.*,
   Case No. ED14CV01725VAP, 2016 WL 7496769
   (C.D. Cal. Apr. 12, 2016) ................................................................ 15

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................... 6, 7

**TABLE OF AUTHORITIES**
*(cont'd)*

Page No(s).

*Clear Blue, Inc. v. Clear! Blue, Inc.*,
  No. 3:07-cv-00339-W, 2008 WL 5232897
  (W.D.N.C. Dec.12, 2008) ................................................................. 8

*Coach, Inc. v. Master of Handbags*,
  Case No. CV 11-0041 SJO, 2011 WL 13220295 (C.D. Cal.
  Sept. 20, 2011) ............................................................................ 21

*Color Me Mine Enterprises Inc. v. Southern States Marketing Inc.*,
  Case No. CV 12-00860-RGK, 2013 WL 12119715
  (C.D. Cal. Apr. 25, 2013) .............................................................. 23

*Columbia Pictures Television, Inc. v. Krypton Broad. of
  Birmingham, Inc.*,
  259 F.3d 1186 (9th Cir. 2001) ....................................................... 23

*Coryn Group II LLC v. O.C. Seacrets, Inc.*,
  Civil No. WDQ-08-2764,2010 ........................................................ 8

*First Savings Bank, F.S.B. v. U.S. Bancorp*,
  117 F. Supp. 2d 1078 (D. Kan. 2000) ........................................... 18

*Govino, LLC v. Goverre, Inc.*,
  Case No. 8:17-cv-01237-JLS-E, 2018 WL 7348849
  (C.D. Cal. Nov. 20, 2018) ........................................................ 23, 24

*Gucci Am., Inc. v. Guess*,
  858 F.Supp.2d 250 (S.D.N.Y. 2012) ............................................... 8

*House v. Bell*,
  547 U.S. 518 (2006) ........................................................................ 6

*ITT Corp. v. Xylem Group, LLC*,
  963 F. Supp. 2d 1309 (N.D. Ga. 2013) .............................. 6, 10, 11

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
  828 F.3d 1098 (9th Cir. 2016) ....................................................... 16

**TABLE OF AUTHORITIES**
*(cont'd)*

Page No(s).

*Jumpitz Corp. v. Viacom Int'l, Inc.*,
   Case No. 09CV1063-MMA (WVG), 2010 WL 11684784
   (S.D. Cal. May 13, 2010) ............................................................... 17

*Lindy Pen Co. v. Bic Pen Corp.*,
   982 F.2d 1400 (9th Cir. 1993), abrogated by *SunEarth, Inc. v.*
   *Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016)......... 1, 11, 12, 20

*Mastercard Intern. Inc. v. First Nat. Bank of Omaha, Inc.*,
   Case No. 02 Civ. 3691(DLC), 03 Civ. 707(DLC), 2004 WL
   326708 (S.D.N.Y. Feb. 23, 2004) ............................................. 18

*Neighborhood Assistance Corp. of America v. First*
*One Lending Corp.*,
   Case No. SACV 12-463 DOC(MLGx), 2012 WL 1698368
   (C.D. Cal. May 15, 2012)............................................................. 19

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
   210 F.3d 1099 (9th Cir. 2000)....................................................... 7

*Oracle Corp. v. SAP AG*,
   765 F.3d 1081 (9th Cir. 2014)....................................................... 9

*Playboy Enterprises, Inc. v. Baccarat Clothing Co .*,
   692 F.2d 1272 (9th Cir. 1982)..................................................... 8, 20

*PODS Enterprises, Inc. v. U-Haul Int'l, Inc.*,
   Case No. 8:12-cv-01479-T-27MAP, 2014 WL 12628663
   (M.D. Fla. June 27, 2014) ........................................................ 12

*QS Wholesale, Inc. v. World Mktg., Inc.*,
   No. SA 12-CV-0451 RNBX, 2013 WL 1953719
   (C.D. Cal. May 9, 2013)......................................................... *passim*

*Quia Corp. v. Mattel, Inc.*,
   No. 10-cv-1902 JF(HRL), 2011 WL 2749576
   (N.D. Cal. July 14. 2011) ........................................................ 9

**TABLE OF AUTHORITIES**
*(cont'd)*

Page No(s).

*Romag Fasteners, Inc. v. Fossil, Inc.*,
    140 S. Ct. 1492 (2020) ................................................................ 1, 20, 21

*Sands, Taylor & Wood v. Quaker Oats Co.*,
    34 F.3d 1340 (7th Cir.1994)...................................................... 7, 8

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ................................................... 9

*Stone Brewing Co., LLC v. MillerCoors LLC*,
    Case No. 3:18-cv-00331-BEN-LL, 2020 WL 907060
    (S.D. Cal. Feb. 25, 2020)........................................................... 10

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005)..................................................... 20

*Tokidoki, LLC v. Fortune Dynamic, Inc.*,
    Case No. CV 07-1923 DSF, 2008 WL 11338730
    (C.D. Cal. May 27, 2008) .......................................................... 23

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014) (per curiam) ......................................... 7

*Trovan Ltd. v. Pfizer, Inc.*,
    No. 98-cv-00094 LGB MCX, 2000 WL 709149
    (C.D. Cal. May 24, 2004) .......................................................... 9

*United Country Real Estate, LLC v. United Realty Group*,
    No. 16-CV-60154, 2017 WL 1293618 (S.D. Fla. 27, 2017)........................ 16

*Universal Motor Oils Co. v. Amoco Oil Co.*,
    809 F. Supp. 816 (D. Kan. 1992) .............................................. 18

*Ventura v. Titan Sports, Inc.*,
    65 F.3d 725 (8th Cir. 1995)....................................................... 12

*Vincent's of Mott Street, Inc. v. Quadami, Inc.*,
    Case No. 05-CV-4358 (SLT), 2009 WL 10705889
    (E.D.N.Y. Sept. 28, 2009) ........................................................ 14

# TABLE OF AUTHORITIES
### (*cont'd*)

Page No(s).

*Yale Electric Corp v. Robertson*,
    26 F.2d 972 (2d Cir.1928) ............................................................ 19

## OTHER AUTHORITIES

15 U.S.C. § 1065 ................................................................................... 4

15 U.S.C. § 1115 ................................................................................... 4

15 U.S.C. § 1117 ................................................................................. 17

J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition*

    (5th ed. 2017) ......................................................................... 14, 15

Plaintiff Pacific Packaging Concepts, Inc. d/b/a Fresh Start Vitamin Co. ("Fresh Start") respectfully submits this Opposition to Defendants Nutrisystem, Inc., Nutri/System IPHC, Inc.'s (collectively, "Defendants" or "Nutrisystem") Motion for Partial Summary Judgment ("Motion").

## I. __INTRODUCTION__

In this motion, Nutrisystem seeks to avoid responsibility for its adoption and widespread use of the mark FRESH START—even though Nutrisystem indisputably knew from the moment it adopted the mark that Fresh Start had an incontestable federal registration for the mark. Nutrisystem's motion, however, relies on law that has not been adopted by the Ninth Circuit and outdated law that was recently rejected by the Supreme Court.

First, Nutrisystem argues that Fresh Start should be precluded from recovering a reasonable royalty as damages because Fresh Start has maintained its exclusive use of its mark and has not licensed it to others. Nutrisystem's argument is not supported by Ninth Circuit precedent. The Ninth Circuit has never held that licensing or an intent to license are prerequisites to an award of a reasonable royalty. In fact, in the context of the similar copyright damages statute, the Ninth Circuit has expressly held that no such requirement exists.

Second, Nutrisystem asserts that Fresh Start should be precluded from recovering disgorgement for infringement due to reverse confusion. According to Nutrisystem, the Ninth Circuit's decision *Lindy Pen* requires a showing that the infringer **_willfully_** "traded off" the goodwill of the trademark owner. Nutrisystem contends that a large company (like Nutrisystem) would never willfully "trade off" the good will of a smaller company (like Fresh Start). But the Supreme Court's recent decision in *Romag* rejected the requirement of willfulness to obtain disgorgement that had been the Ninth Circuit's rule at the time of *Lindy Pen*. Thus, the holding in *Lindy Pen* is no longer good law. (Nutrisystem's argument is also potentially confusing in that it appears to suggest

- 1 -

that Fresh Start may only be claiming reverse confusion in this action.  Fresh Start does, in fact, claim forward confusion in this action.  Fresh Start seeks disgorgement as a remedy for its claim for forward confusion, and Nutrisystem has not argued that Fresh Start is precluded from seeking disgorgement for that claim.)

Finally, Nutrisystem asserts that there is no factual dispute regarding willfulness, even though Nutrisystem does not seek summary judgment on the issue of willfulness.  In fact, Nutrisystem's infringement was willful.  Nutrisystem knew of Plaintiff's incontestable registration for the mark FRESH START and, nonetheless, adopted the identical mark.  Nutrisystem's Chief Marketing Officer and Product Manager responsible for choosing the mark Fresh Start both testified that their legal department never informed them of the trademark searches that Nutrisystem conducted that listed Plaintiff's incontestable registration as the first hit.  (Indeed, Nutrisystem attempted to conceal the searches from this Court. Nutrisystem only produced the searches after ordered to do so by Magistrate Judge Scott.)  Nutrisystem now attempts to justify its infringement by asserting that there is a "crowded field" of Fresh Start marks, but that is unsupported, and, having claimed privilege as to its legal departments analysis of the search results, Nutrisystem cannot now claim that it relied on a belief of non-infringement.

Because each of Nutrisystem's contentions are based on legally and/or factually incorrect bases, this Court should deny Nutrisystem's motion in its entirety.

## II.  **FACTUAL BACKGROUND**

### A.  **Fresh Start Vitamin Co.'s FRESH START Mark**

More than 40 years ago, Bob Cole founded Fresh Start as a family business. Katz. Decl. ¶ 4, Ex. 2 (excerpted transcript of the Deposition of Aubrey "Bob" Cole ("Bob Dep. Tr.")) at 15:23-24; 29:3; 50:8.  He sold vitamins and dietary supplements under the house name Fresh Start.  Bob Dep. Tr. at 21:23-25; 95:5-7.

Through hard work and tremendous investment, the family business grew and thrived.  As the business grew, so did family involvement.  Fresh Start is now run with a second generation of Coles—Bob's son Jonathan Cole and Bob's daughters Jennifer Cole and Cindy Cole.  Bob Dep. Tr. at 73:18-20; 222:6-9, Katz. Decl. ¶ 5, Ex. 3 (excerpted transcript of the Deposition of Cynthia Cole ("Cindy Dep. Tr.")) at 12:8-10, ¶ 6, Ex. 4 (excerpted transcript of the Deposition of Jennifer Cole ("Jennifer Dep. Tr.")) at 13:11-18, ¶ 7, Ex. 5  (excerpted transcript of the Deposition of Jonathan Cole ("Jonathan Dep. Tr.")) at 14:10-15:8.

The family's investment in the FRESH START brand has been enormous. Fresh Start spent more than $10 million in advertising and promoting its FRESH START products through trade shows, catalogs, mailings, product giveaways, and in-store display racks.   B. Cole Decl. ¶ 3. Exs. B-D.  As a result, the FRESH START brand has earned a strong following of loyal customers.  In fact, hundreds of Fresh Start's customers have written to express their appreciation for the high quality of the FRESH START products.  B. Cole Decl. ¶ 4, Exs. E-G; Katz Decl. ¶ 5, Ex. 3 (Cindy Dep. Tr. at 72:15-81:5; 83:15-84:16).  Customers also rave about Fresh Start's customer service.  B. Cole Decl. ¶ 4, Ex. H ("Thank you…for representing your company in such a professional and kindly manner"); Ex. I ("you are truly an example of what the corporate world needs more of"); Ex. J "[C]ustomer service these days isn't what it used to be. In your case its (sic) actually better.").

The success of Fresh Start's business is reflected in its sales.  Fresh Start has sold hundreds of millions of FRESH START packets, with a retail value of more than $660 million. B. Cole Decl. ¶ 7, Ex. K.  Fresh Start's customers buy its products on Amazon, Walmart.com, in thousands of convenience stores, at health food stores, and other retailers nationwide.  J. Cole Decl. ¶ 2, Ex. A; / / /

- 3 -

1  Katz. Decl. ¶ 22-24, Exs. 20-22.  Fresh Start also sells its products on its own
2  website.  B. Cole Decl. ¶ 2, Ex. A.
3       In 2001, Fresh Start received U.S. Reg. No. 2,463,131 for the mark FRESH
4  START for dietary supplements containing multi-vitamins and minerals.  Katz.
5  Decl. ¶ 3, Ex. 1.  The registration is incontestable under 15 U.S.C. § 1065.  *Id.*
6  Because it is incontestable, the registration is conclusive evidence of the validity
7  of the mark and Fresh Start's exclusive right to use it with dietary supplements.
8  15 U.S.C. § 1115(b).
9  **B.   Nutrisystem's Use of FRESH START**
10      Almost 40 years after Fresh Start began using the mark FRESH START,
11 Fresh Start was startled to see Nutrisystem's national advertising campaign
12 featuring the name "Fresh Start."  Nutrisystem used the name directly on a
13 "Probiotic Shake Mix," its diet program, and likely in connection with the sale of
14 vitamin packets.  *See, e.g.*, Katz. Decl. ¶ 8, Ex. 6 (excerpted transcript of the
15 Deposition of Jay Butt ("Butt Dep. Tr.")) at 224:13-225:18).  Indeed, Nutrisystem
16 prominently featured "Fresh Start" in its advertising for nearly all of its products.
17 *See, e.g.*, Katz. Decl. ¶¶ 26-29, Exs. 23-27.  Nutrisystem sold its shakes through
18 physical and online retailers, including Amazon, Target, Walmart, QVC, and
19 large grocery store chain.  *Id.* ¶ 25, Ex. 23, ¶¶ 22-24, Exs. 20-22, ¶ 9, Ex. 7
20 (excerpted transcript of the Deposition of LeeAnn Kindness ("Kindness Dep.
21 Tr.")) at 72:17-20; 170:14-171:19; (Schossberger Tr. 32:2-12); Butt Tr. 197:15-
22 199:21.  Nutrisystem also sold its "Fresh Start" product through its own website
23 and call centers.  Krausz Dep. Tr. at 45:10-13.
24      One of Fresh Start's long-time customers saw Nutrisystem's television
25 commercials and mistakenly thought that Fresh Start had either "teamed up" with
26 Nutrisystem or had been "bought out."  *Id.* ¶ 12, Ex. 10 (Hauter Dep. Tr. at 64:5-
27 9).  A few months later, another customer called Fresh Start and mentioned that
28 he had seen a Fresh Start commercials on television.  Bob Tr. 214:22-216:11.  As

- 4 -

early as 2015, Nutrisystem knew that the Fresh Start had an incontestable registration for the mark FRESH START for dietary supplements. Nutrisystem first ran a trademark search for the mark FRESH START in July 2015.  Katz. Decl. ¶ 16, Ex. 14.  The very first result on the search report was Fresh Start's FRESH START mark and incontestable registration.  *Id*.

Three years later, in August 2018, Nutrisystem considered adopting a new mark.  Katz. Decl. ¶ 11, Ex. 9 Krausz Dep. Tr. at 83:6-85:16; ¶ 19, Ex. 16; ¶ 19, Ex. 17.  Nutrisystem conducted consumer research on dozens of marks. *Id*. ¶ 20-21, Exs. 18-19.  The research determined that "Fresh Start" "was the clear program name winner!"  *Id*.  Nutrisystem again ran a trademark search for the mark FRESH START.  *Id*. ¶, Ex. 15.  Again, Fresh Start's FRESH START mark was first on the list.  *Id*.  Nevertheless, Nutrisystem chose to adopt Fresh Start's mark without even attempting to seek permission or obtain a license.

## C.   <u>Nutrisystem's Infringement Has Harmed Fresh Start</u>

Nutrisystem's infringing use of the FRESH START mark has been extensive.  *Id*. ¶¶ 30-32, Exs. 28-30; ¶ 33, Ex. 31.  Nutrisystem featured "Fresh Start" in national TV campaign.  *Id*. ¶ 25, Ex. 23; ¶ 33, Ex. 31.  Nutrisystem's estimated expenditures for advertisements featuring "Fresh Start" totaled more than ██████.  *Id*. ¶ 33, Ex. 31.  A still from one of the commercials is shown below:



*Id*. ¶ 25, Ex. 23.

The marketplace confusion caused by Nutrisystem's use of the FRESH START mark harmed the distinctiveness, perceived quality, positive consumer associations, and consumer loyalty that Fresh Start built in its brand. *Id*. ¶ 34-38, Exs. 33-37.   This damage is compounded by Nutrisystem's own checkered history, including customer complaints of misleading advertising, unsupported weight loss promises, and hidden cancellation fees.  Until 2013, Nutrisystem was under a federal consent order with the FTC regulating Nutrisystem's advertising and requiring additional disclosures.  *Id*. ¶¶ 39-45, Exs. 38-44.  Nutrisystem has also defended a number of consumer lawsuits over the years, including a lawsuit in the 1990's alleging that Nutrisystem products contributed to gallbladder disease. *See, e.g.*, *id*. ¶ 60, Ex. 59.

Nutrisystem's own database of consumer feedback recounts numerous customers' negative experiences with Nutrisystem's "Fresh Start" probiotic shakes.  *Id*. ¶ 46, Ex. 45 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; ¶ 47, Ex. 46 ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; ¶ 48, Ex. 47.

Nutrisystem continued its infringement even after the filing of this action. Nutrisystem's sales database indicates that Nutrisystem sold orders for meal plans or other products that included a "Fresh Start"-branded product placed ***after*** the filing of the complaint totaling more than ▮▮▮▮▮▮▮ . *Id*. ¶¶ 31-32, Exs. 29-30.

## III.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate if the evidence and all reasonable inferences in the light most favorable to the nonmoving party "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). On summary judgment, a court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House*

- 6 -

*v. Bell*, 547 U.S. 518, 559-60 (2006).  The "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

The moving party has the burden of demonstrating the absence of genuine issues of fact for trial.  *Celotex*, 477 U.S. at 323.  To meet this burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted).  Once the moving party satisfies its initial burden of production, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact.  *Id.* at 1103.

## IV.  <u>A REASONABLE ROYALTY IS AN APPROPRIATE MEASURE OF FRESH START'S DAMAGES</u>

### A.  <u>Courts Regularly Award a Reasonable Royalty as a Measure of Damages in Trademark Actions</u>

"Reasonable royalties, which are a calculation of the hypothetical licensing royalties that an infringer would have paid to the senior owner of a mark, can be recovered as a measure of damages in trademark infringement cases."  *QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA 12-CV-0451 RNBX, 2013 WL 1953719, at *4 (C.D. Cal. May 9, 2013); *see also Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1350 (7th Cir.1994) ("one measure of actual damages that, if ascertained with reasonable certainty, could be said to reflect the actual loss of [the trademark owner]—the cost of a reasonable royalty"); *ITT Corp. v. Xylem Group, LLC*, 963 F. Supp. 2d 1309, 1330 (N.D. Ga. 2013) ("[a] careful reading of *Dowagiac* and *Sheldon* compel the conclusion that the 'reasonable royalty' theory of damages is a viable, if not necessary, measure of

protecting the property rights afforded a trademark holder under the Lanham Act."). "Even in cases without [prior licensing] agreements ... courts have awarded or approved of 'reasonable royalty' damages if the evidence provides a sufficiently reliable basis from which to calculate them." *Gucci Am., Inc. v. Guess?, Inc.*, 858 F.Supp.2d 250, 253-254 (S.D.N.Y. 2012); see also *adidas Am., Inc. v. Payless Shoesource, Inc.*, No. 01 Civ. 1655, 2008 WL 4279812, at * 12 (D.Or. Sept.12, 2008); *Sands, Taylor & Wood* 34 F.3d at 1343; *Coryn Group II LLC v. O.C. Seacrets, Inc.*, Civil No. WDQ-08-2764,2010 WL 1375301, at *8 (D.Md. Mar.30, 2010); *Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.*, 606 F.Supp.2d 571, 585 (M.D.N.C.2009); *Clear Blue, Inc. v. Clear! Blue, Inc.*, No. 3:07-cv-00339-W, 2008 WL 5232897, at *4–5 (W.D.N.C. Dec.12, 2008).

As the Ninth Circuit has held, "[i]t is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement." *Playboy Enterprises, Inc. v. Baccarat Clothing Co .*, 692 F.2d 1272, 1275 (9th Cir. 1982). *See QS Wholesale, Inc.*, No. SA 12-CV-0451 RNBX, 2013 WL 1953719, at *5 ("[i]f reasonable royalties were not available, large corporations could" avoid paying for their use of a smaller company's mark and could "count on a financial windfall stemming from their own nonpayment in the event that the infringement does not create disgorgeable profits.")

**B.  The Ninth Circuit Does Not Require Intent to License to Obtain a Reasonable Royalty**

Nutrisystem argues that, in the Ninth Circuit, reasonable royalty damages would be impermissibly speculative where the plaintiff has not presented evidence of an intent to license the mark.  Mem. at 12.  The Ninth Circuit has made no such holding.  *QS Wholesale*, 2013 WL 1953719, at *5. To the contrary, the Ninth Circuit has held that "the preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of

/ / /

the circumstances." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir. 1997).

In the copyright context, where the damages available for infringement are similar to those for trademark, the Ninth Circuit has expressly rejected the argument that a copyright owner must show that it would have licensed its work in order to recover a reasonable royalty. *Oracle Corp. v. SAP AG,* 765 F.3d 1081, 1087 (9th Cir. 2014) ("We have never required a plaintiff in a copyright infringement case to show that it would have licensed the infringed material. We decline to impose such a requirement now."). The Ninth Circuit reasoned that:

> "If we were to require a copyright holder to demonstrate that it would have been willing to grant a license as a condition for recovering damages based on the fair market value of the license, the perverse result would be that some of the most assiduously protective copyright holders would be unable to recover the fair market value of their wrongfully appropriated copyrighted property."

*Id.* at 1087. The same reasoning applies here. If a trademark owner were required to demonstrate that it would have been willing to grant a license, then trademark owners most protective of the exclusivity of their marks would have a disadvantage in recovering damages for infringement.

Courts in this District and in the Ninth Circuit have declined to adopt the holding of the cases cited by Nutrisystem. *See, e.g.*, *Quia Corp. v. Mattel, Inc.*, No. 10-cv-1902 JF(HRL), 2011 WL 2749576 (N.D. Cal. July 14. 2011) and *Trovan Ltd. v. Pfizer, Inc.,* No. 98-cv-00094 LGB MCX, 2000 WL 709149 (C.D. Cal. May 24, 2004). As the court explained in *QS Wholesale*, 2013 WL 1953719, at *4,

> "[S]ome courts have held that '[w]here a plaintiff has failed to present evidence of an intent to license its trademark, a reasonable royalty analysis necessarily is speculation' and royalties cannot be

- 9 -

recovered. *Quia,* 2011 WL 2749576, at \*7 (citing *Trovan,* 2000 WL 709149; *Tokidoki, LLC v. Fortune Dynamic, Inc.,* 2009 WL 2366439 (C.D.Cal. July 28, 2009)). The Ninth Circuit has made no such categorical statement, however, finding only more generally that '[i]n the absence of a legitimate proposed basis on which to calculate a royalty, awarding a reasonable royalty ... would be impermissibly speculative.' *M2 Software Inc. v. Viacom Inc.,* 223 F. App'x 653, 655 (9th Cir. 2007)."

Thus, the court in *QS Wholesale*, denied a motion for summary judgment that reasonable royalties were precluded because there was no prior license between the parties and no history of the trademark owner ever licensing the mark. *QS Wholesale*, 2013 WL 1953719, at \*5.

Other courts in the Ninth Circuit have also rejected a requirement that a trademark owner show a history of licensing or an intent to license for recovery of a reasonable royalty. In *adidas*, the court upheld a jury's reasonable royalty award even though there was no previous license between the parties and the plaintiff conceded that it would not have licensed its marks to the defendant. *adidas America*, 2008 WL 4279812, at \*12. Similarly, in *Stone Brewing Co., LLC v. MillerCoors LLC*, Case No. 3:18-cv-00331-BEN-LL, 2020 WL 907060 (S.D. Cal. Feb. 25, 2020), the court rejected a *Daubert* motion that sought to exclude expert witness testimony on reasonable royalties as speculative and lacking reasonable certainty. In its *Daubert* motion, the defendant argued that "Stone Brewing, its witnesses," and its expert "have consistently acknowledged that Stone Brewing would ***not*** have entered into an agreement that would associate it with 'Big Beer,' including MillerCoors and its products." Katz. Decl. ¶ 55, Ex. 54 (page 10).

Courts in other circuits have also rejected requiring a history of licensing as a prerequisite to obtaining a reasonable royalty. In *Xylem Group*, the defendant

- 10 -

argued that reasonable royalties in trademark cases should be limited to plaintiffs that can point to an established royalty based on an actual license. *ITT Corp.*, 963 F. Supp. 2d at 1331.   The court rejected this argument, explaining that the defendant's "narrow interpretation is not consistent with the Supreme Court's reasoning in *Dowagiac* and *Sheldon* or with the generally accepted use of a reasonable royalty for damage calculations." *Id*. at 1331

**C.      A Reasonable Royalty Can Be Determined Here Based on Nutrisystem's Valuation of its Marks and Rates Others Have Paid to Use Similar Marks**

One accepted method of calculating a reasonable royalty is a "relief from royalty" analysis. *See Active Sports Lifestyle USA LLC v. Old Navy, LLC*, No. SACV1200572JVS (Ex), 2013 WL 11239385, at \*16 (C.D. Cal. Nov. 21, 2013). (In the "relief from royalty" approach, an expert estimates the amount that a business would pay to license its own intellectual property assets in an arms-length transaction.)  The method is particularly appropriate here: the defendant used that very method to value trademark rights in its SEC filings and in its due diligence when acquiring the former corporate incarnation of Nutrisystem. *Id.;* Krausz Dep. Tr. at 115:14-119:7; Katz. Decl. ¶ 14, Ex. 12 (excerpted transcript of the Deposition of Brian N. Napper ("Napper Dep. Tr.")) at 47:15-22 ("[KPMG] assigned a royalty rate of ▮▮▮▮ to the Nutrisystem brand and a royalty rate of ▮▮▮▮ to the South Beach Diet brand."); *id*. ¶ 13, Ex. 11 (excerpted transcript of the Deposition of Christian Tregillis ("Tregillis Dep. Tr.")) at 198:18-25 ("KPMG did an analysis and saw rates being paid and licensed for different markets and concluded ▮▮▮▮ and ▮▮▮▮ were rates applicable to Nutrisystem and South Beach Diet respectively."); *id*. ¶ 49, Ex. 48; *id*. ¶ 50, Ex. 49.

Damages "are not rendered uncertain because they cannot be calculated with absolute exactness." *Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1407

- 11 -

1   (9th Cir. 1993), abrogated by *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839
2   F.3d 1179 (9th Cir. 2016).  Rather, what is required is "a reasonable basis for
3   computation." *Id.*

4        Fresh Start's brand valuation expert, Wes Anson, performed a "relief from
5   royalty" analysis and calculated that a reasonable royalty for the use of the
6   FRESH START mark would likely fall within the range of ██████████  *See*
7   Katz. Decl. ¶ 51, Ex. 50 ("Anson Report") at 4.  Mr. Anson's qualifications
8   include an MBA with honors from Harvard and extensive industry experience
9   valuing trademarks, including at the accounting firm of Booz-Allen & Hamilton
10  and as Senior VP of Hang Ten (which had 100 licensees in 30 countries).  *Id*. at
11  31.  As recognized by a panel of the Eighth Circuit, "Anson's qualifications are
12  quite impressive." *Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 735 (8th Cir. 1995).

13       In his analysis, Mr. Anson reviewed royalty rates from numerous sources,
14  including industry data, annual royalty rate industry surveys, and public
15  documentation from corporate 10-Q and 10-K forms.   Katz. Decl. ¶ 51, Ex. 50
16  ("Anson Report") at 10.  Mr. Anson's review of licensing transactions included a
17  RoyaltyStat® database of 6,286 trademark license agreements and a
18  RoyaltyStat® database of 626 agreements specifically in the food and non-
19  alcoholic beverages space.  *Id*.  Mr. Anson reviewed the license agreement
20  database information and narrowed the list of agreements to 11 agreements
21  licensing trademarks comparable to the FRESH START mark. *Id*. (Exhibit 3 of
22  Anson Report).  Methodologies that rely on comparable licenses are routinely
23  used by damages experts and found to be helpful in determining a reasonable
24  royalty.  *See, e.g.*, *PODS Enterprises, Inc. v. U-Haul Int'l, Inc.*, Case No. 8:12-
25  cv-01479-T-27MAP, 2014 WL 12628663 (M.D. Fla. June 27, 2014).

26       Fresh Start's damages expert, Christian Tregillis, also calculated a
27  reasonable royalty based on Nutrisystem's own relief from royalty valuation of
28  its own marks. Katz. Decl. ¶ 52, Ex. 51 (Tregillis Report) at 25.  Mr. Tregillis is

- 12 -

a CPA and received his MBA from the University of Chicago. *Id*. at 31.  Among his many qualifications, Mr. Tregillis was a partner at Deloitte & Touche. *Id*.

Mr. Tregillis reviewed a 2019 document produced by Nutrisystem titled, "Valuation of Certain Assets Related to the Acquisition of Nutrisystem, Inc." *Id*. at 25 (citing NUTRISYSTEM00023499).  The analysis included appraisals of two trademarks acquired by Tivity as part of its acquisition of Nutrisystem: NUTRISYSTEM and SOUTH BEACH DIET. *Id*. at 27.  The royalty rate applied by KPMG to NUTRISYSTEM was ▮ and the rate applied to SOUTH BEACH DIET was ▮. *Id*. at 28.  Mr. Tregillis concluded that these rates "are instructive to the value of the trademark-in-suit, given that they are performed in the normal course of business, outside a dispute context, there is no litigation influence on the analysis, the analysis is performed by an outside appraiser, and the appraisal is adopted by the company in the preparation of financial statements prepared under Generally Accepted Accounting Principles, reflecting management's best estimate of the value of assets owned by the company." *Id*.

Accordingly, the evidence supports a reasonable royalty payment within the range of ▮ to ▮.  The evidence is not speculative.

**D.    Fresh Start has Never Entered into Any Royalty-Free Coexistence Agreement for the FRESH START Mark or Any Similar Mark**

Nutrisystem also argues that it should not have to pay a royalty for its use of the FRESH START mark because "both parties have signed royalty-free coexistence agreements with an array of companies using Fresh Start or Start-based marks."  That is incorrect.  Fresh Start has never entered into a "royalty-free coexistence agreement" for FRESH START.  B. Cole Decl. ¶ 8.  None of the coexistence agreements cited by Nutrisystem involved any mark that included the term "FRESH." *Id*. ¶¶ 9-15, Exs. L-R.  Unlike Nutrisystem's use of the identical mark FRESH START, the coexistence agreements involved companies using other marks in ways that did not cause a likelihood of confusion. *Id*.  Moreover,

- 13 -

these agreements were all executed almost 20 years ago and, therefore, should be given little or no weight in estimating a license agreement that Fresh Start and Nutrisystem would have hypothetically signed in 2018.

Nutrisystem also did not enter into any agreement for any "Fresh Start" mark until many months after this lawsuit was filed.  At that time, Nutrisystem sought out a coexistence agreement with a company using the mark "Fresh Start" for frozen fruit and vegetables used to make smoothies and another company using the mark "Fresh Start Gourmet" for smoothies.  Katz. Decl. ¶ 53, Ex. 52, ¶ 54, Ex. 53.  Neither of the companies that agreed to coexist with Nutrisystem has any rights whatsoever in the mark FRESH START for dietary supplements.

Further, coexistence agreements are not licenses. By definition, in a coexistence agreement, "party *A* is not granting a right to use to Z in return for payment of royalties."  *See* 3 McCarthy on Trademarks and Unfair Competition § 18:79 (5th ed.).  Courts have long recognized the difference between coexistence agreements and license agreements.  *See, e.g.*, *Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 364 (5th Cir. 2004); *Buc-ee's Ltd. v. BUCKS, Inc.*, Case No. 8:17CV287, 2018 WL 818312 (D. Neb. Feb. 9, 2018); *Vincent's of Mott Street, Inc. v. Quadami, Inc.*, Case No. 05-CV-4358 (SLT), 2009 WL 10705889, at *6 (E.D.N.Y. Sept. 28, 2009).  Parties enter coexistence agreements where they do not anticipate any confusion as long as the parties abide by the terms of the agreement.  *Id.*  Accordingly, the coexistence agreements cited by Nutrisystem have no bearing on a reasonable royalty calculation.

**E.**    **Nutrisystem Has Not Shown That Any Other Parties Use the Mark "Fresh Start" for Dietary Supplements or Related Products**

Nutrisystem also argues that it should not have to pay a royalty because of the allegedly "crowded field" of "Fresh Start" marks.  Mem. at 11.  However, there is no crowded field of "Fresh Start" marks for use with the ***same or related goods***.  A "crowded field" only exists if a mark "is hemmed in on all sides by

- 14 -

similar marks on **similar** goods or services . . . ."  *See* 2 McCarthy § 11:85 (emphasis added).  In *BuzzBalls*, for example, the mark at issue concerned alcoholic beverages and, thus, the court excluded evidence of third party use of similar marks used with restaurant services, non-alcoholic beverages, beverages made from coffee, dietary supplements for enhancing the experience of consuming alcohol, and breathalyzers.  *BuzzBalls, L.L.C. v. BuzzBox Beverages, Inc.*, Case No. ED14CV01725VAP (DTBx), 2016 WL 7496769, at *1-2 (C.D. Cal. Apr. 12, 2016).  Here, goods that are unlike those offered by Fresh Start and Nutrisystem should similarly be disregarded.

Nutrisystem points to a list of marks that it characterizes as "Fresh Start marks." Katz. Decl. ¶ 58, Ex. 57.  However, unlike Nutrisystem's **identical** FRESH START mark, two-thirds of the marks cited by Nutrisystem (in Exhibit 3 of Jay Butt's Declaration) do not consist of "FRESH START" or "FRESHSTART."  Further, the small handful of FRESH START marks are for goods that are not related to Fresh Start's vitamin and dietary supplements.

The uses of "Fresh Start" in Nutrisystem's list include body mist (No. 17), body lotion (No. 18), hand soap (No. 19), hair care preparations (No. 29), disposable wipes (No. 34), educational mentoring services (No. 35), and deodorant (No. 43).  These goods are services are plainly not related to the vitamins, dietary supplements, and nutritional probiotic shakes at issue.

Moreover, Nutrisystem has produced no evidence that the marks on its list are actually in use other than the Oregon Potato Company's "Fresh Start" mark and the "Fresh Start Gourmet" mark for smoothies.  Webpage printouts and trademark registrations are not admissible to show that a mark is currently being used in commerce.  *See Buzzballz, L.L.C. v. Buzzbox Beverages, Inc.*, No. ED14-CV-01725-VAP-DTBX, 2016 WL 7496769, at *3 (C.D. Cal. Apr. 12, 2016) ("Defendants must submit more than the homepage of a company's website and lay a foundation for it to show each Mark is actually used in commerce."); *see*

*also United Country Real Estate, LLC v. United Realty Group*, No. 16-CV-60154, 2017 WL 1293618, at *5 (S.D. Fla. 27, 2017) (excluding expert testimony regarding third party usage of 66 similar trademarks where there was no "information or data regarding the **extent** to which the 66 third-party marks have been used.") (emphasis in original).

## V. <u>FRESH START MAY SEEK DISGORGEMENT OF PROFITS FOR INFRINGEMENT BASED ON REVERSE CONFUSION</u>

### A.    <u>Fresh Start Claims Both Forward And Reverse Confusion</u>

Infringement can be shown by forward confusion or reverse confusion. Here, Fresh Start asserts both.  Forward confusion is where consumers familiar with Fresh Start's FRESH START brand see Nutrisystem's "Fresh Start" shakes or commercials and believe they are associated with Fresh Start.  *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016). Nutrisystem incorrectly asserts that Fresh Start's evidence of actual confusion from Fresh Start's customer, Christian Hauter, was reverse confusion.  Mem. at 15.  In fact, Mr. Hauter has been purchasing dietary supplements from Fresh Start for more than 40 years.  Hauter Dep. Tr. at 16:12-13 ("because I've been buying these vitamins since 1980")).  His concern that Nutrisystem's Fresh Start products were associated with Fresh Start, or that Fresh Start "sold out" to Nutrisystem, is classic forward confusion—a customer of the senior mark holder sees the infringer and mistakenly believes there is an affiliation.

Reverse confusion, in contrast, occurs where a consumer familiar only with the accused infringer, often due to its extensive advertising, sees the trademark owner's products and mistakenly believes that they originate from the accused infringer.  *Boldface Licensing + Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1186-88 (C.D. Cal. 2013).  Mr. Hauter, a longtime Fresh Start customer, did not believe that Nutrisystem was the source of the Fresh Start dietary

/ / /

supplements that Mr. Hauter had been purchasing for years before he ever saw Nutrisystem's use of Fresh Start.

Further, Fresh Start's survey expert, Brian Sowers, conducted a survey of forward (not reverse) confusion.   Mr. Sowers determined that there was a likelihood of confusion because 37.7% of survey respondents in the test group, said that the company who makes or puts out the Nutrisystem FRESH START Probiotic Shake Mix is the same company or has a business connection, affiliation, or association with the company that makes or puts out the FRESH START Complete Daily Vitamin Pack.   Sowers Decl. ¶ 14.

In this motion, Nutrisystem only seeks partial summary judgment that disgorgement is not a remedy for reverse confusion.   It is undisputed that disgorgement is a remedy available for infringement for forward confusion. Thus, even if this Court were to grant this motion, which it should not, Fresh Start could still seek disgorgement for infringement based on forward confusion.

**B.**   **Disgorgement of Profits Has Long Been a Remedy for Infringement Based On Reverse Confusion**

15 U.S.C. § 1117(a) allows a trademark owner that establishes infringement to recover the defendant's profits.  Courts have frequently discussed disgorgement as a remedy available to trademark holders asserting reverse confusion.   For example, in *Jumpitz Corp. v. Viacom Int'l, Inc.*, Case No. 09CV1063-MMA (WVG), 2010 WL 11684784, at *3 (S.D. Cal. May 13, 2010), the plaintiff asserted only reverse confusion.   The court noted that the Ninth Circuit's holding that 15 U.S.C. § 1117(a) confers "a wide scope of discretion upon the district judge in the fashioning of a remedy for a violation of the [Lanham Act]." *Id* at 10. (citing *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968).  The court then explained that the plaintiff could potentially recover disgorgement defendant's profits. *Id*. at *11. / / /

In *First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1088-89 (D. Kan. 2000), another case where the plaintiff asserted reverse confusion, the court explained that the plaintiff could obtain disgorgement. Similarly, in *Amicus Communications, L.P. v. Hewlett-Packard Co.*, Case No. Civ.A. SA-98-CA1176PM, 2000 WL 33348186 (W.D. Tex. Jan. 10, 2000), another reverse confusion case, the court denied the defendant's motion for summary judgment because disputed issues of fact remained that precluded summary judgment on the plaintiff's request for disgorgement of profits. *Id.* at 20. In *Mastercard Intern. Inc. v. First Nat. Bank of Omaha, Inc.*, Case No. 02 Civ. 3691(DLC), 03 Civ. 707(DLC), 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004), the court confirmed that disgorgement was available as a remedy for reverse confusion, concluding that "whether [plaintiff] is entitled to an accounting of [defendant's] profits . . . must be determined by the jury upon a full development of the relevant factual record." *Id.* at *12.

In *Universal Motor Oils*, another reverse confusion case, the court confirmed the availability of disgorgement. "The court can order an accounting of profits upon a proper showing that defendant may have wrongfully gained from its infringement." *Universal Motor Oils Co. v. Amoco Oil Co.*, 809 F. Supp. 816, 821-22 (D. Kan. 1992).

## C.   <u>Fresh Start is Not Seeking a Windfall</u>

Nutrisystem also argues that Fresh Start has not been harmed by Nutrisystem's infringement and is seeking a "windfall." Fresh Start has, in fact, been harmed by Nutrisystem's use of its mark because it has confused consumers as to whether Fresh Start has licensed, or is affiliated with, Nutrisystem. As discussed above, Nutrisystem has had a history of customer complaints, lawsuits, and an FTC consent order. Fresh Start, in contrast, has a very strong reputation for its high quality products and a very loyal customer following. Hauter Dep. Tr. at 48:24-49:1 ("they have a really good quality control."); 90:24 ("they got

good quality products."); Katz. Decl. ¶ 15, Ex. 13 (excerpted transcript of the Deposition of Finamore Dep. Tr. at 40:23-24 ("Finamore Dep. Tr.") ("they had a very strong presence in a certain segment of the market.").

Fresh Start's loss of the ability to control its reputation for quality constitutes a legally cognizable injury. *Neighborhood Assistance Corp. of America v. First One Lending Corp.*, Case No. SACV 12-463 DOC(MLGx), 2012 WL 1698368 (C.D. Cal. May 15, 2012) ("Loss of good will or the loss of the ability to control one's own reputation is a cognizable harm under the Lanham Act.") (citing *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)). As stated by Judge Learned Hand,

> [A merchant's] mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use....

*Yale Electric Corp v. Robertson*, 26 F.2d 972, 974 (2d Cir.1928). Similarly, Fresh Start has been harmed by Nutrisystem depriving Fresh Start of its ability to control its reputation for high quality products.

Nutrisystem also argues that disgorgement would result in a windfall to Fresh Start because Nutrisystem is a large company with hundreds of millions in annual sales, whereas Fresh Start has only ▮▮▮▮▮▮▮ in annual sales. There is no rule that a small company cannot seek disgorgement as a remedy when a larger company infringes the smaller company's trademark. Such a rule would allow large companies to infringe without regard to the harm to a smaller trademark owner, knowing that the profits of the larger company would dwarf any potential recovery by the smaller company for the infringement. The argument contradicts the Ninth's Circuit's holding that "it is essential" that trial courts fashion remedies that take all the economic incentive out of trademark

infringement.  *Playboy Enterprises,* 692 F.2d at 1275; *see also QS Wholesale,* 2013 WL 1953719, at *5.

## D.   *Lindy Pen's* Requirement That a Defendant Intentionally Trade On the Trademark Owner's Goodwill is No Longer Good Law

Nutrisystem also argues that disgorgement is inappropriate because, according to Nutrisystem, it cannot be said to "trade on" Fresh Start's goodwill since Fresh Start is not as large as Nutrisystem and does not advertise as heavily as Nutrisystem.  Mem. at 18.  However, since the Supreme Court's decision in *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492 (2020), there is no longer any requirement that an infringer willfully "trade on" the goodwill of the trademark owner to obtain disgorgement.  Nutrisystem's relies on *Lindy Pen Co., 982 F.2d at 1405* and *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005).  Both of those cases predate the Supreme Court's holding in *Romag*, and both applied the standard that the Supreme Court rejected that required willful infringement for disgorgement.

*Lindy Pen*, 725 F.2d at 1405, held that disgorgement is available "only in those cases where the infringement is 'willfully calculated to exploit the advantage of an established mark.'"  In *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492 (2020), the Supreme Court expressly rejected willfulness as a pre-requisite to disgorgement of profits. The Supreme Court explained, "we do not doubt that a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate. But acknowledging that much is a far cry from insisting on the inflexible precondition" of willful infringement.  *Id.* at 1497.  Accordingly, the portions of *Lindy Pen* and *Surfvivor Media* that Nutrisystem relies on as requiring a willful intent to trade off of the goodwill of the trademark owner are no longer good law.

/ / /

/ / /

**E.    Willfulness is Not Required for Disgorgement of Profits Post-*Romag***

Since the Supreme Court's decision in *Romag,* willfulness is no longer a precondition for a trademark plaintiff seeking disgorgement of profits. Nutrisystem cites *Airhawk Int'l, LLC v. Ontel Products Corp.*, Case No. 18-cv-00073-MMA-AGS, 2020 WL 2306440 (S.D. Cal. May 8, 2020), as a case applying willfulness to determine that disgorgement is not appropriate even after *Romag*.  Nutrisystem's reliance on *Airhawk* is misplaced.  *Airhawk* involved an untimely motion for reconsideration, rather than an original summary judgment motion. *Id.* at *3. Moreover, unlike in *Airhawk*, there is strong evidence that Nutrisystem willfully infringed Fresh Start's mark.  Additionally, in *Airhawk*, the court justified its denial of the motion for reconsideration stating that, it was "not a case, moreover, where the defendant violated the Lanham Act and emerged unscathed."  *Id.* at *5.  Here, by contrast, Nutrisystem seeks to avoid damages remedies in the hopes that it can infringe Fresh Start's mark and emerge unscathed.  Although *Romag* allows a court to consider the defendant's state of mind in awarding profits, *Romag* is very clear that willful infringement is not a requirement.  *Romag Fasteners*, 140 S. Ct. at 1497.

**F.    Nutrisystem's Infringement of Fresh Start's FRESH START Trademark Rights Was Willful**

"The question of willfulness is generally a question of fact for the jury." *Coach, Inc. v. Master of Handbags*, Case No. CV 11-0041 SJO (FMOx), 2011 WL 13220295 (C.D. Cal. Sept. 20, 2011) (citing *Hearst Corp. v. Stark*, 639 F. Supp. 970, 980) ("The determination of willfulness under the applicable standards is generally a question of fact for the jury.").  Perhaps recognizing this, Nutrisystem does not move for partial summary judgment of no willfulness.

Nutrisystem, nonetheless, argues that there is no genuine dispute of the facts surrounding Nutrisystem's adoption and use of the mark Fresh Start. Nutrisystem is incorrect.  It is undisputed that Nutrisystem was aware of Fresh

Start's incontestable FRESH START mark and nonetheless chose to adopt the identical mark.  Krausz Dep. Tr. at 83:6-85:16; Katz. Decl. ¶ 19, Exs. 16-17; Nov. 6, 2020 Stipulation, Dkt. No. 47.

Nutrisystem's assertion that it made a "good faith" decision to use the mark in light of the allegedly "crowded field" is unsupported and contrary to the evidence. As discussed above, there is no evidence of a "crowded field" of "Fresh Start" marks for supplements or related products.  Moreover, there is no admissible evidence that Nutrisystem relied on any search of third-party marks when it knowingly adopted a mark identical to Fresh Start's incontestable mark. Nutrisystem's only evidence that it allegedly relied on a "crowded field" is a statement from its CFO, Jay Butt.  However, Mr. Butt had no involvement in selecting the FRESH START mark and thus, does not have personal knowledge about and cannot testify regarding Nutrisystem's considerations.  Krausz Dep. Tr. at 26:6-29:10; Nutrisystem's Second Supplemental Initial Disclosures; Statement of Genuine Disputes ¶ 17.

Keira Krausz, Nutrisystem's Chief Marketing Officer testified that she was ultimately responsible for choosing the mark, and she was not aware of ██████ ████████████████████████████ Krausz Dep. Tr. at 29:7-10 ("Probably the final decision-makers would be David Burton and the final final myself with input from legal."); 62:11-17; 70:4-6 ("I have not seen this before, so I would not have been aware of ████████████."). Moreover, Nutrisystem's witnesses involved in the decision to adopt the mark Fresh Start testified that the legal department ████████████. When asked about advice provided by the legal department regarding ██████, Nutrisystem's witnesses refused to respond on the basis of attorney-client privilege.  Krausz Dep. Tr. at 29:11-30:3; Kindness Dep. Tr. at 140:9-13.  Having claimed the privilege, Nutrisystem cannot now rely on any opinion that their adoption of the identical Fresh Start mark would not cause confusion.  *See Columbia Pictures Television, Inc. v. Krypton*

- 22 -

*Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) ("The privilege which protects attorney-client communications may not be used both as a sword and a shield.")

Further, even after Fresh Start brought this lawsuit, Nutrisystem continued its infringement and continued its advertising.  Courts have found that where defendants continue to engage in the infringing activity after being informed of a plaintiff's rights, defendants' continued infringement favors a finding of willfulness.  In *Color Me Mine*, the court held that a reasonable juror could infer that the defendants acted with an intent to deceive consumers given that the defendants "permitted shipments of the [allegedly infringing products] to continue [for] several months after the First lawsuit was filed."  *Color Me Mine Enterprises Inc. v. Southern States Marketing Inc.*, Case No. CV 12-00860-RGK (JCx), 2013 WL 12119715, at *11 (C.D. Cal. Apr. 25, 2013).  The defendants argued that their reliance on advice of counsel should negate any finding of willfulness, but the court found that, "[w]hile it appears that the Peachtree Entities reasonably relied on her advice at the outset, it may have been unreasonable for the Peachtree Entities to have continued to rely on her January 2008 advice–that no likelihood of confusion would occur–after several critical events, namely the TTAB decision and filing of the First lawsuit."  *Id.* at 11.

Similarly, in *Tokidoko*, the court found that evidence that the alleged infringer continued to sell its allegedly infringing products after being informed of plaintiff's rights in its mark precluded summary judgment on the issue of willfulness. *Tokidoki, LLC v. Fortune Dynamic, Inc.*, Case No. CV 07-1923 DSF (PJWx), 2008 WL 11338730 *7 (C.D. Cal. May 27, 2008).

In *Govino*, the court denied defendant's motion for summary judgment on willfulness despite defendant's argument that they procured three legal opinions during the course of the alleged infringement. *Govino, LLC v. Goverre, Inc.*, Case No. 8:17-cv-01237-JLS-E, 2018 WL 7348849, at *5 (C.D. Cal. Nov. 20, 2018)

(emphasis added).  The first opinion stated that counsel did not think there was a likelihood of confusion.  The second "opinion" was the PTO's failure to cite any of plaintiff's trademarks during the prosecution of defendant's trademark applications.  The third opinion was obtained from counsel after defendant had already decided to move forward with the new name.  The court concluded that "[n]one of the three purported legal opinions are sufficiently exculpatory to support a finding of no willfulness as a matter of law."  *Id*. at *6.

Here, Nutrisystem knew of Fresh Start's incontestable rights before Nutrisystem began its infringement and continued after Fresh Start filed this lawsuit.  Nutrisystem did not rely on the advice of its attorneys to rebut the assertion of willfulness and, instead, refused to disclose its attorneys' advice, asserting the attorney-client privilege.  As in *Govino,* Nutrisystem points to the PTO's failure to cite Fresh Start's registration against Nutrisystem's application to register the mark "Fresh Start," but the PTO likely did not find Plaintiff's mark in its search because Nutrisystem failed to identify "dietary supplements" in its list of goods.  Katz. Decl. ¶ 56, Ex. 55, ¶ 57, Ex. 56.  Thus, contrary to Nutrisystem's assertion, the PTO's finding does not support Nutrisystem's assertion of good faith.  *See* Mem. at 23.

## G.     **Nutri/System IPHC Is a Proper Party to this Lawsuit**

Nutri/System IPHC, Inc. is a corporation that was organized under the laws of Delaware.  Nutri/System IPHC, Inc. dissolved in 2019.  "Delaware law provides that expired or dissolved corporations continue, for at least three years, to maintain the ability to prosecute and defend lawsuits."  *Boeing Company v. KB Yuzhnoye*, Case No. CV-13-00730-AB (AJWx), 2015 WL 12803452 *2 (C.D. Cal. Nov. 3, 2015) (citing Del. Code Ann. Tit. 8, § 278).  Nutri/System IPHC, Inc. is a party that existed and played a role in a substantial portion of the timeline applicable to this case.  Dissolution of a relevant entity is not a legitimate basis to not be joined as a party.  Nutrisystem asserts that maintaining Nutri/System IPHC,

Inc. as a party is wasteful and burdensome but provides no basis for that assertion. Accordingly, this Court should deny Nutrisystem's motion to dismiss Nutri/System IPHC, Inc. as a party to this lawsuit.

## VI.  <u>CONCLUSION</u>

For at least the foregoing reasons, this Court should deny Nutrisystem's motion for partial summary judgment in its entirety.


Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated: February 1, 2021          By: */s/ Lauren Keller Katzenellenbogen*
Michael K. Friedland
Lauren Keller Katzenellenbogen
Jason A. Champion

Attorneys for Plaintiff
Pacific Packaging Concepts, Inc

34239377