1

Michael K. Friedland (SBN 157,217)
Michael.Friedland@knobbe.com

2

Lauren Keller Katzenellenbogen (SBN 223,370)
Lauren.keller@knobbe.com

3

Jason A. Champion (SBN 259,207)
Jason.Champion@knobbe.com

4

KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor

5

Irvine, CA 92614
Telephone: (949) 760-0404

6

Facsimile: (949) 760-9502

7

8

Attorneys for Plaintiff
Pacific Packaging Concepts, Inc.

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

WESTERN DIVISION

12

PACIFIC PACKAGING CONCEPTS,
INC.,

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| PACIFIC PACKAGING CONCEPTS, INC., | Civil Action No. 2:19-cv-04755-ODW-Ex |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| NUTRISYSTEM, INC., NUTRI/SYSTEM IPHC, INC., | **Hearing; March 8, 2021**<br>**Time: 1:30 pm**<br>**Ctrm: 5D** |
| Defendants. | **Final Pretrial Conf.: March 22, 2021**<br>**Trial Date: April 20, 2021** |
| | **Hon. Judge Otis D. Wright II** |

REDACTED VERSION OF DOCUMENT PROPOSED
TO BE FILED UNDER SEAL

# TABLE OF CONTENTS

**Page No.**

I.     INTRODUCTION ....................................................................................1

II.    FACTUAL BACKGROUND ..................................................................2

       A.    Fresh Start Vitamin Company ....................................................2

       B.    Nutrisystem ................................................................................3

III.   LEGAL STANDARD ............................................................................5

IV.    SUMMARY JUDGMENT SHOULD BE GRANTED ON
       FRESH START'S CLAIMS RELATING TO THE
       NUTRISYSTEM'S FRESH START SHAKES ......................................6

       A.    Fresh Start has Valid, Protectable Rights in the FRESH
             START Trademark .......................................................................6

       B.    Defendants' Fresh Start Probiotic Shake Mix is Likely
             to Cause Confusion with the FRESH START
             Trademark ...................................................................................6

             1.    Fresh Start Has Strong Rights in Its FRESH
                   START Trademark ..............................................................7

                   a.    The FRESH START Mark is Conceptually
                         Strong and Inherently Distinctive .............................8

                   b.    The FRESH START Mark is
                         Commercially Strong .................................................9

             2.    Fresh Start's FRESH START Vitamin Packets
                   and Nutrisystem's FRESH START Shakes Are
                   Both Dietary Supplements ................................................11

                   a.    Consumers Expect Probiotic Shakes and
                         Vitamin and Mineral Supplements to
                         Originate from the Same Source ..............................13

             3.    The Parties' Marks Are Identical ......................................15

             4.    There is Evidence of Actual Forward Confusion ..............16

                   a.    Incidents of Customer Confusion.............................17

                   b.    Survey Evidence of Actual Confusion....................18

**TABLE OF CONTENTS**
(***cont'd***)

**Page No.**

5. The Parties' Goods Travel Through the Same Channels ..................................................................19

6. The Parties' Goods Are Relatively Inexpensive and Purchased Without Great Care ....................................20

7. Nutrisystem Knew of Fresh Start's FRESH START Mark Before Adopting it for the FRESH START Shakes ..................................................................22

8. Likelihood of Expansion ....................................................23

C. Fresh Start is Entitled to Summary Judgment on its Unfair Competition and Common Law Trademark Infringement Claims ......................................................24

V. CONCLUSION ........................................................................24

# TABLE OF AUTHORITIES

**Page No(s).**

*Ambrit, Inc. v. Kraft, Inc.,*
812 F.2d 1531 (11th Cir. 1986) ..................................................... 21

*AMF, Inc. v. Sleekcraft Boats,*
599 F.2d 341 (9th Cir. 1979) ............................................... *passim*

*Applied Info. Scis. Corp. v. eBay, Inc.,*
511 F.3d 966 (9th Cir. 2007) ........................................................ 6

*Bank of Am. Nat'l Trust & Savings Assc'n v. The First National
Bank of Allentown,*
220 U.S.P.Q. 892 (T.T.A.B. 1984) ............................................... 23

*Black & Decker Corp. v. Emerson Electric Co.,*
2007 WL 894416 (T.T.A.B. March 23, 2007) ............................. 14

*Bose Corp. v. QSC Audio Products, Inc.,*
293 F.3d 1367 (Fed. Cir. 2002) ................................................... 10

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,*
174 F.3d 1036 (9th Cir. 1999) ............................................. *passim*

*Carl Karcher Enterprises Inc. v. Stars Restaurants Corp.,*
35 U.S.P.Q.2d 1125 (T.T.A.B. 1995) ........................................... 22

*Charles Schwab & Co., v. Hibernia Bank,*
665 F. Supp. 800 (N.D. Cal. 1987) ................................................ 8

*Clicks Billiards, Inc. v. Sixshooters, Inc.,*
251 F.3d 1252 (9th Cir. 2001) ..................................................... 18

*Coach Servs., Inc. v. Cielo Creations, Inc.,*
No. CV 10-4108 GAF (EX), 2011 WL 13217091
(C.D. Cal. Aug. 16, 2011) ............................................................. 5

*Conversive, Inc. v. Conversagent, Inc.,*
433 F. Supp. 2d 1079 (C.D. Cal. 2006) ................................. *passim*

*Discovery Communications, Inc. v. Animal Planet, Inc.,*
172 F. Supp. 2d 1282 (C.D. Cal. 2001) ...................................... 20

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*Dorr-Oliver Inc. v. Fluid-Quip, Inc.*,
  834 F. Supp. 1008 (N.D. Ill. Oct. 4, 1993)....................................................... 23

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir.1992) ........................................................................... 9

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*,
  741 F. Supp. 2d 1165 (C.D. Cal. Sept. 30, 2010) ......................................... 18

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
  314 F.2d 149 (9th Cir. 1963).................................................................... 11, 13

*Fuji Photo Film Co. v. Shinohara Shoji*,
  754 F.2d 591 (5th Cir. 1985) ......................................................................... 22

*General Mills, Inc. v. Fage Dairy Processing Industry S.A.*,
  100 U.S.P.Q.2d 1584 (T.T.A.B. 2011)........................................................... 17

*GoTo.com v. Walk Disney Company*,
  202 F.3d 1199 (9th Cir. 2000).......................................................... 7, 15, 22

*Henri's Food Prods. Co. v. Kraft, Inc.*,
  717 F.2d 352 (7th Cir. 1983) ......................................................................... 21

*Humble Oil & Ref. Co. v. Am. Oil Co.*,
  405 F.2d 803 (8th Cir. 1969) ......................................................................... 19

*James Burrough Ltd. v. Sign of the Beefeater, Inc.*,
  540 F.2d 266 (7th Cir. 1976) ......................................................................... 19

*Karl Storz Imaging Inc. v. Pointe Conception Medical, Inc.*,
  CV09-8070 GAF (Ex), 2011 WL 13195980
  (C.D. Cal. Aug. 11, 2011) ............................................................................... 8

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*,
  150 F.3d 1042 (9th Cir. 1998).................................................................... 8, 16

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
  408 F.3d 596 (9th Cir. 2005)............................................................................ 8

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
   762 F.3d 867 (9th Cir. 2014) ................................................................ 7, 13

*La. World Exposition, Inc. v. Logue*,
   746 F.2d 1033 (5th Cir. 1984) .................................................... 21

*Lerma v. Armijo*,
   No. CV 15-9953, 2017 WL 2233617 (C.D. Cal. May 22, 2017) ................... 5

*M2 Software, Inc. v. Madacy Entm't*,
   421 F.3d 1073 (9th Cir. 2005) .................................................... 8

*MEGAComfort, Inc. v. Impacto Protective Prod., Inc.*,
   No. SACV 13-952-JLS-AJWX, 2013 WL 12119557
   (C.D. Cal. Nov. 14, 2013) ........................................................ 21

*Nissan Motor Co. v. Nissa Computer Corp.*,
   2007 WL 9374946 (C.D. Cal. Sept. 21, 2007) .............................. 10

*Official Airline Guides, Inc. v. Goss*,
   6 F.3d 1385 (9th Cir. 1993) ................................................. 22, 23

*Perfumebay.com v. eBay, Inc.*,
   506 F.3d 1165 (9th Cir. 2007) ................................................. 17

*Playmakers, LLC v. ESPN, Inc.*,
   297 F. Supp. 2d 1277 (W.D. Wash. 2003), *aff'd*, 376 F.3d 894
   (9th Cir. 2004) ..................................................................... 9

*Pom Wonderful LLC v. Hubbard*,
   775 F.3d 1118 (9th Cir. 2014) ............................................. 16, 19

*Pom Wonderful LLC v. Hubbard*,
   No. CV13-06917RGK, 2016 WL 3621281
   (C.D. Cal. June 29, 2016) ...................................................... 5, 7

*Power Balance LLC v. Power Force LLC*,
   Case No. SACV 10-1726 AG, 2010 WL 5174957
   (C.D. Cal. Dec. 14, 2010) ...................................................... 20

**TABLE OF AUTHORITIES**
*(cont'd)*

**Page No(s).**

*Recot, Inc. v. Becton*,
 214 F.3d 1322 (Fed. Cir. 2000) ...................................................... 13

*Ruiz Food Products, Inc. v. Camino Real Foods, Inc.*,
 Case No. 1:09-CV-1732 AWI SMS, 2009 WL 3642777
 (E.D. Cal. Oct. 30, 2009)............................................................... 21

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
 875 F.3d 426 (9th Cir. 2017) ......................................................... 16

*Synergistic Int'l. Inc. v. Windshield Doctor, Inc.*,
 No. CV 03-579 FMC (CWx), 2003 WL 21468568
 (C.D. Cal. Apr. 28, 2003) ............................................................... 9

*Synoptek, LLC v. Synaptek Corp.*,
 309 F. Supp. 3d 825 (C.D. Cal. 2018)...................................... 5, 14

*Thane Intern., Inc. v. Trek Bicycle Corp.*,
 305 F.3d 894 (9th Cir.2002) .......................................................... 17

*Wells Fargo & Company v. Wells Fargo Construction Co.*,
 619 F. Supp. 710 (D. Ariz. 1985) .................................................. 18

*Zobmondo Entertainment v. Falls Media LLC*,
 602 F.3d 1108 (9th Cir. 2010) ......................................................... 9

**OTHER AUTHORITIES**

TMEP § 807.03........................................................................................ 16

15 U.S.C. § 1115 ...................................................................................... 6

Fed. R. Civ. P. 56..................................................................................... 5

J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition*
 (5th ed. 2017)................................................................... 8, 9, 17

Plaintiff Pacific Packaging Concepts Inc. dba Fresh Start Vitamin Company ("Fresh Start") hereby moves for partial summary judgment on its trademark infringement, false designation of origin, and unfair competition claims against Nutrisystem, Inc. and Nutri/System IPHC, Inc., (collectively "Nutrisystem") relating to the Nutrisystem FRESH START shakes.

## I.  INTRODUCTION

For more than 40 years, the Fresh Start family business has used its mark—FRESH START—in connection with its sales of vitamins and dietary supplements.  It sells its products across the country through retail locations, through its own website, and through Internet retailers including Amazon and Walmart.com.  And its sales have been substantial:  in units, more than half a billion; in dollars, almost three-quarters of a billion.

In 2015, Nutrisystem began considering a new trademark for some of its product offerings.  Among other names, Nutrisystem considered "Fresh Start." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  In 2018, Nutrisystem again considered a new trademark.  Nutrisystem again considered "Fresh Start," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Despite being completely aware of Fresh Start's trademark, Nutrisystem adopted the exactly identical mark "Fresh Start" for a number of its products, including a "Fresh Start" probiotic shake.

In this action, Fresh Start alleges that all of Nutrisystem's products using the "Fresh Start" mark infringe Fresh Start's trademark rights.  In order to simplify this motion, however, this motion addresses only the question of whether Nutrisystem's "Fresh Start" probiotic shake infringes Fresh Start's trademarks. As demonstrated below, consideration of the *Sleekcraft* factors in light of the undisputed factual record establishes that there are no genuine issues of fact and

/ / /

that Fresh Start is entitled to partial summary judgment that Nutrisystem's "Fresh Start" probiotic shake infringes Fresh Start's FRESH START trademark.

## II.  FACTUAL BACKGROUND

### A.  Fresh Start Vitamin Company

Fresh Start is a family business founded in Southern California by Bob Cole in 1980.  B. Cole Decl. ¶ 2.  The company sells vitamins and dietary supplements. *Id*.  All its products display the FRESH START mark on their packaging and have for 40 years.  *Id*.  In addition to using the FRESH START mark as a house mark, the company also offers a dietary supplement called FRESH START.  *Id*. ¶ 3, Ex. A.

As Fresh Start grew it added products and expanded its distribution channels.  Today, its products can be found on Amazon, Walmart.com, and in thousands of convenience stores, health food stores, and supermarkets around the country.  *Id*. ¶ 4 , Ex. B;  J. Cole Decl. ¶ 2, Ex. A; Champion Decl. Exs. 1, 2 (J. Cole Tr. 162:18-163:19).   Fresh Start's success is reflected in its sales.  Since 1980, Fresh Start has sold more than half a billion vitamin packets, with a combined retail value of more than half a billion dollars.  B. Cole Decl. ¶ 5.

The family investment in the FRESH START brand has been significant. The Coles have spent more than ███████ in advertising and promoting their FRESH START products through trade shows, catalogs, mailings, product giveaways, and in-store display racks.  *Id*. ¶ 6.  As a result, the FRESH START brand has earned a strong following of loyal customers.  Over the years, hundreds of customers have written and called to express their appreciation for the high quality of the FRESH START products.  Champion Decl. Ex. 3 (Cindy Tr. 72:15-81:5; 83:15-84:19); B. Cole Decl. ¶ 7, Ex. D ("If vitamins were cars then all your products would be Ferraris"); Ex. E ("your products are much better than GNC and other high priced vitamins"); Ex. F ("I just want to say that your products are the best on the market!").

- 2 -

To protect their investment and goodwill, Fresh Start filed for trademark protection in 1998. Champion Decl. Ex. 4. In 2001, the PTO issued Registration No. 2,463,131 for the mark FRESH START in connection with "dietary supplements containing multi-vitamins and minerals." *Id*. That registration is now incontestable. *Id*.

## B.    <u>Nutrisystem</u>

Founded in 1972, Nutrisystem sells weight management products and services, including weight loss programs, multi-day kits, bars, shakes, and dietary supplements. *Id*. Exs. 5-7. Like Fresh Start, Nutrisystem has also sold a line of daily vitamin packets. *Id*. Ex. 7. Nutrisystem also sells its products on Amazon, Walmart.com, and in retail stores. *Id*. Ex. 8 (Butt Tr. 195:22-197:4; 197:15-199:21).

In August 2018, Nutrisystem selected a name for its new probiotic shake and meal plan program. *See id.* Exs. 9-10; Ex. 49 (Krausz Tr. 26:13-20). Nutrisystem chose FRESH START. It chose the mark despite the fact that it knew Fresh Start had already used and registered the name. *Id*. Exs. 11, 12; Dkt. 47.

1 ████████████████████████████████████████████████████

2 ████████████████████ Nutrisystem pushed ahead and adopted the FRESH

3 START mark, not only for its new meal plan program but also its for its first week

4 meal kits and probiotic shakes.  *Id*. Exs. 10, 13, 14.

5        In December 2018, Nutrisystem began featuring the FRESH START mark

6 in its television advertising and on social media.  *See, e.g.*, Champion Decl. Exs.

7 14-16.  By early 2019, Nutrisystem used the FRESH START mark everywhere.

8 *Id*. Exs. 14-18.  In total, Nutrisystem spent more than ██████████ advertising its

9 FRESH START shakes, meal plan program, and first week kits.  *Id*. ¶ 18, Ex. 16.

10 One of Fresh Start's long-time customers saw Nutrisystem's television

11 commercials and mistakenly thought that Fresh Start had either "teamed up" with

12 Nutrisystem or had been "bought out."  *Id*. Ex. 19 (Hauter Dep. Tr. at 63:24-

13 65:17).  A few months later, another customer called Fresh Start and mentioned

14 that he had seen a Fresh Start commercials on television.  *Id*. Ex. 20 (Bob Tr.

15 214:22-216:11).  Because Fresh Start did not have TV commercials it understood

16 that the customer had seen one of Nutrisystem's advertisements and wrongly

17 believed that Nutrisystem's shakes or meal plan kits were connected to Fresh

18 Start.  B. Cole Decl. ¶ 8.

19        As a result of this confusion and concerns that Nutrisystem would cause

20 irreversible damage to the Fresh Start brand, Fresh Start filed this lawsuit.  Dkt.

21 No. 1.  Despite being served with the complaint and a cease and desist letter,

22 Nutrisystem continued its infringement unabated ████████████████

23 Champion Decl. Exs. 16, 21-23.  ████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28 ████████████████████████████

In the interests of streamlining the issues at trial, Fresh Start now moves for summary judgment on its claims relating to the Nutrisystem FRESH START shakes.[1]

### III.  LEGAL STANDARD

Summary judgment is appropriate when the material factual issues are not in dispute.  Fed. R. Civ. P. 56.   "Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment." *Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079, 1083 (C.D. Cal. 2006).  Courts in this judicial district have often granted summary judgment in trademark cases where the likelihood of confusion analysis can be made as a matter of law. *See Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 842 (C.D. Cal. 2018) (granting summary judgment where strength of the mark, similarity of the marks and proximity of goods weighed in favor of plaintiff); *Pom Wonderful LLC v. Hubbard*, No. CV13-06917RGK (JPRx), 2016 WL 3621281 (C.D. Cal. June 29, 2016) (granting summary judgment where five of the eight *Sleekcraft* factors favored plaintiff);  *see also Coach Servs., Inc. v. Cielo Creations, Inc.*, No. CV 10-4108 GAF (EX), 2011 WL 13217091 (C.D. Cal. Aug. 16, 2011); *Lerma v. Armijo*, No. CV 15-9953 (JEMX), 2017 WL 2233617 (C.D. Cal. May 22, 2017).

/ / /

/ / /

/ / /

---

[1] Fresh Start maintains all its claims against Nutrisystem's other FRESH START products and its request for partial summary judgment should not be interpreted in any way as conceding that Nutrisystem's other FRESH START products do not infringe or otherwise violate Fresh Start's trademark rights.  Fresh Start will pursue its claims against the remaining Nutrisystem FRESH START products at trial.

## IV.  SUMMARY JUDGMENT SHOULD BE GRANTED ON FRESH START'S CLAIMS RELATING TO THE NUTRISYSTEM'S FRESH START SHAKES

To prevail on its claims for trademark infringement and false designation of origin under 15 U.S.C. §§ 1114 and 1125, respectively, Fresh Start must show: (1) it has a valid, protectable trademark, and (2) Defendants' used a similar mark likely to cause confusion.  *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007).

### A.  Fresh Start has Valid, Protectable Rights in the FRESH START Trademark

There is no dispute that Fresh Start has valid and protectable rights in the FRESH START mark.  Fresh Start owns U.S. Registration No. 2,463,131 for the FRESH START mark in connection with "dietary supplements containing multi-vitamins and minerals."   Champion Decl. Ex. 4.  The registration issued on June 26, 2001 and has been incontestable since October 4, 2006.  *Id.*  When a mark becomes incontestable, it constitutes "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b).

Fresh Start has also acquired common law rights in its FRESH START mark due to its extensive sales and advertising of products that display the mark throughout the United States.  B. Cole Decl. ¶¶ 5-6, Ex. C.

### B.  Defendants' Fresh Start Probiotic Shake Mix is Likely to Cause Confusion with the FRESH START Trademark

In the Ninth Circuit, courts evaluate likelihood of confusion by weighing the eight *Sleekcraft* factors: (1) the strength of the mark, (2) the proximity or relatedness of the goods, (3) the similarity of the marks, (4) evidence of actual confusion, (5) the marketing channels used, (6) the type of goods and degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the

mark, and (8) the likelihood of expansion of the product lines.  *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-349 (9th Cir. 1979).  The court need not address all the factors, and the claimant need not establish that every factor weighs in its favor in order to establish a likelihood of confusion.  *See e.g.*, *Pom Wonderful*, 2016 WL 3621281 at *13 (granting summary judgment of trademark infringement where only five of the eight *Sleekcraft* factors weighed in favor of plaintiff); *Conversive*, 433 F. Supp. 2d at 1093 (granting summary judgment of trademark infringement where all *Sleekcraft* factors either weighed in favor of plaintiff or were neutral).  Indeed, it is often possible to reach a conclusion after considering only a subset of the factors.  *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

Here, when applied to Nutrisystem's FRESH START shakes, all the relevant factors weigh in favor of Fresh Start.  Accordingly, the Court should grant Fresh Start's motion for partial summary judgment of trademark infringement and false designation of origin.

### 1. Fresh Start Has Strong Rights in Its FRESH START Trademark

Courts evaluate a trademark's "strength" in terms of its (1) conceptual strength, and (2) commercial strength.  *GoTo.com v. Walk Disney Company*, 202 F.3d 1199, 1207 (9th Cir. 2000).  Conceptual strength relates to the distinctiveness of the mark, for example whether it is generic or fanciful.  *Id*. Commercial strength refers to the strength that the mark acquires through its use in the marketplace.  *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 874-875 (9th Cir. 2014).  As explained below, there is overwhelming evidence that the FRESH START mark has both conceptual and commercial strength.

/ / /

/ / /

### a.    <u>The FRESH START Mark is Conceptually Strong and Inherently Distinctive</u>

The conceptual strength of a mark is determined by its placement in one of five categories of distinctiveness (generic, descriptive, suggestive, arbitrary, or fanciful). *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005). The latter three categories are considered inherently distinctive and automatically entitle a mark to protection. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005). When a mark is inherently distinctive, there is no need to prove that it has acquired secondary meaning. J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition* § 11:1 (5th ed. 2017) ("*McCarthy*").

Here, Fresh Start's mark is arbitrary as applied to dietary supplements. Arbitrary marks consist of commonly used words or symbols which are arbitrarily applied to the goods or services in question. *See Charles Schwab & Co., v. Hibernia Bank*, 665 F. Supp. 800, 805 (N.D. Cal. 1987). In contrast, a descriptive or suggestive mark will describe or suggest characteristics or features of the goods or services in question. *See e.g. Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998) (categorizing "Honey Baked Ham" as a descriptive mark because it describes a ham that has been baked with honey) (citation omitted); *Karl Storz Imaging Inc. v. Pointe Conception Medical, Inc.*, CV09-8070 GAF (Ex), 2011 WL 13195980 at *17 (C.D. Cal. Aug. 11, 2011) (categorizing "Roach Motel" as a suggestive mark for insect traps) (citation omitted).

Unlike the "Honey Baked Ham" and "Roach Motel" marks, the FRESH START mark is neither descriptive nor suggestive when viewed in the context of dietary supplements. Multiple dictionaries define "fresh start" as "an opportunity to start over without prejudice." Champion Decl. Exs. 25, 26. That definition has no relevance to Fresh Start's dietary supplements or daily vitamin packets.

Moreover, the PTO's issuance of a trademark registration creates a strong presumption that a mark is inherently distinctive. *McCarthy* § 11:43; *Zobmondo Entertainment v. Falls Media LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010) ("federal registration provides 'prima facie evidence' of the mark's validity and entitles the plaintiff to a 'strong presumption' that the mark is a protectable mark") (citations omitted); *see also Synergistic Int'l. Inc. v. Windshield Doctor, Inc*., No. CV 03-579 FMC (CWx), 2003 WL 21468568, at *4 (C.D. Cal. Apr. 28, 2003) (finding that an incontestable mark was strong without considering its presence in the market because incontestability "constitutes conclusive evidence of Plaintiff's exclusive right to use the mark as well as the mark's distinctiveness.").

Here, the PTO issued the FRESH START registration in 2001, and it has been incontestable since 2006. Champion Decl. Ex. 4. Accordingly, the Court should find the FRESH START mark is inherently distinctive and entitled to protection.

### b.   <u>The FRESH START Mark is Commercially Strong</u>

Although Fresh Start need not rely on commercial strength because its mark is inherently distinctive, the undisputed evidence establishes that the FRESH START mark is commercially strong. To demonstrate commercial strength, trademark owners rely on evidence such as the length and manner of use of the mark, the amount of advertising, and the volume of sales. *Playmakers, LLC v. ESPN, Inc.*, 297 F. Supp. 2d 1277, 1281 (W.D. Wash. 2003), *aff'd*, 376 F.3d 894 (9th Cir. 2004).

Here, there is no dispute that Fresh Start began using its mark on dietary supplements in 1980 and has continued to do so for over 40 years. B. Cole Decl. ¶ 2. This history of continuous use in the marketplace evidences a commercially strong mark. *See E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291 (9th Cir.1992) (affirming finding that plaintiff's trademark was strong, based on decades of continuous use). There is also no dispute that Fresh Start has sold over

500 million dietary supplement packets bearing the FRESH START mark.  B. Cole Decl. ¶ 5.  Total retail sales of these products exceed $660 million with over $100 million coming from sales of Fresh Start's original FRESH START product.  *Id*.   The sheer volume of these numbers demonstrates indirect consumer awareness in two ways: first by the vast number of purchases that have been made of the marked products, and second by the extent to which the public has been exposed to advertising in the form of the marked products.  *See Bose Corp. v. QSC Audio Products, Inc.*, 293 F.3d 1367, 1371 (Fed. Cir. 2002).  These numbers alone establish that the FRESH START mark is commercially strong.

It is also undisputed that Fresh Start sells its products in thousands of convenience stores, health food stores, and other retail outlets throughout the country.  B. Cole Decl. ¶ 4, Ex. B; J. Cole Decl. ¶ 2 Ex. A.  The geographical diversity of Fresh Start's sales suggests a widespread acceptance of the brand among consumers and further supports a finding of commercial strength. *See Nissan Motor Co. v. Nissa Computer Corp.*, CV99-12980 DDP (MCx), 2007 WL 9374946 at *(C.D. Cal. Sept. 21, 2007) (sales of millions of vehicles through network of dealers across the country supported finding that plaintiff's mark had become famous).

Fresh Start has also spent more than ██████ promoting its brand through trade shows, free product giveaways, and the purchase of in-store display racks that feature the FRESH START mark.  B. Cole. Decl. ¶ 6.  Fresh Start's branded display racks have appeared in thousands of convenience stores across the country and are so ubiquitous that they can be seen in popular movies and television series such as *Superbad* and *NCIS*.  *Id*.

Experienced individuals in the vitamin industry also acknowledge the strength of the FRESH START mark.  Michael Finamore, CEO of Gemini Pharmaceuticals, testified that he believed Fresh Start had a "very strong presence" in the vitamin market.  Champion Decl. Ex. 27 (Finamore Tr. 40:17-

24).  He also testified that he considered Fresh Start "a leading brand in their particular class of trade" and that Gemini was "proud to make [] products for them." *Id*. (Finamore Tr. 52:14-53:5).  Mr. Finamore's testimony is notable given that he has worked in the vitamin industry for 20 years and operates a $100 million dollar supplement company that supplies vitamins for many well-known companies, including Walmart.  *Id*. (Finamore Tr. 9:10-14; 37:16-38:8; 51:20-25).

### 2. Fresh Start's FRESH START Vitamin Packets and Nutrisystem's FRESH START Shakes Are Both Dietary Supplements

The second *Sleekcraft* factor assesses the proximity or relatedness of the parties' goods.  *Sleekcraft* 599 F.2d at 350.  The greater the relatedness of the goods, the more likely consumers will be confused by similar marks.  *See Brookfield*, 174 F.3d at 1055.  To assess proximity, the relevant question is not whether consumers can distinguish between the plaintiff and defendant's products, but whether those products are the kind that the public attributes to a single source.  *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir. 1963).

Here, both parties use their marks on identical goods, namely dietary supplements.  Merriam-Webster defines a dietary supplement as "a product taken orally that contains one or more ingredients (such as vitamins or amino acids) that are intended to supplement one's diet and are not considered food."  Champion Decl. Ex. 28.  There is no dispute that Fresh Start's products are dietary supplements and are labeled as such.  B. Cole Decl. ¶ 2, Ex. A.  And although Nutrisystem refuses to admit that its FRESH START shake is a dietary supplement, the product fits squarely within the definition.  Indeed, the shake is consumed orally and is labeled as containing "23 Vitamins and Minerals" including Vitamins A, $B_6$, $B_{12}$, C, D, E, and K:

/ / /

1  / / /

 

Champion Decl. Ex. 29.

The shakes also contain 1140% of the recommended daily dose of chromium, as well as other minerals such as calcium, phosphorus, potassium, manganese, iron, copper, and zinc. *Id.*

These vitamins and minerals are clearly intended to supplement one's diet and would not be considered food. Nutrisystem's Product Manager, LeeAnn Kindness, ███████████████████████████████████

███████████████████████████████████

███[2] *Id.* Ex. 30 [Kindness Tr. 120:7-121:14]. Nutrisystem's website and blog also refer to chromium as a "weight management supplement" as opposed to a food. *Id.* Exs. 7, 32. And Nutrisystem's financial disclosure acknowledges that

---

[2] Nutrisystem designated Ms. Kindness as its corporate representative on the topic of "The macronutrients, vitamins, and minerals contained in Your FRESH START Shake Mix and the reasons for including them in their particular amounts." Champion Decl. Ex. 31.

it operates in an industry that includes "dietary supplements." *Id.* Ex. 5 at NUTRISYSTEM00000991.

### a. Consumers Expect Probiotic Shakes and Vitamin and Mineral Supplements to Originate from the Same Source

Throughout discovery Nutrisystem has gone to extreme lengths to avoid referring to the FRESH START shakes as a dietary supplement. *See id.* Ex. 30 (Kindness Tr. 112:1-115:16), Ex. 33 (Macbride Tr. 112:18-113:6), Exs. 34-35 (Nutrisystem's Responses to RFAs Nos. 1, 5, 8, 9, 18, 22, 23, 26, 27, 31, 41, 141, 160, 175, 186). Whether Nutrisystem refers to its FRESH START shakes as dietary supplements or not is irrelevant for purposes of analyzing the proximity of the parties' goods. That is because the relevant issue is whether ***consumers*** expect probiotic protein shakes and vitamins and mineral supplements to come from a common source. *See Fleischmann*, 314 F.2d at 159. Courts will infer consumer expectations by looking at whether the parties' goods and services at issue are offered from the same source in the market. *See Recot, Inc. v. Becton*, 214 F.3d 1322, 1328-29 (Fed. Cir. 2000) (evidence that others sell both plaintiff's and defendant's goods deemed "extremely pertinent" to the issue of likelihood of confusion). When this occurs repeatedly in the market, it tends to prove that consumers are "conditioned" and accustomed to seeing the parties' goods originating from a common source and, thus, confusion is more likely. *See La Quinta*, 762 F.3d at 875.

Here, many companies offer both probiotic shakes and vitamin and mineral supplements. For example, GNC, Herbalife, Nature's Bounty, Nature's Way, Garden of Life, and Renewlife all offer both probiotic shakes and vitamin and mineral supplements. Champion Decl. Exs. 36-41. Nutrisystem itself has sold both products, including dietary supplements in daily vitamin packets. *Id.* Ex. 7, Ex. 32, Ex. 34 (Nutrisystem Responses to RFA Nos. 40-41), Ex. 42. And although Nutrisystem sold its vitamin packets under a different mark

- 13 -

(Nutrisystem Essentials), the fact that it sold both vitamins *and* other FRESH START-branded products supports a finding that the goods are related. *See Black & Decker Corp. v. Emerson Electric Co.*, 2007 WL 894416 *8-*9 (T.T.A.B. March 23, 2007) (finding relatedness where one party sold both parties' products but did so under different marks).  This evidence weighs heavily in favor of likelihood of confusion. *Synoptek*, 309 F.Supp.3d at 838 ("Because the parties offer identical and related services to their customers, this factor weighs heavily in favor of finding a likelihood of confusion").

Consumers also expect shakes and vitamins to originate from the same source because they often encounter the products near one another in the marketplace.  For example, Nutrisystem sells its shake products in Walmart as well as grocery stores ██████████████████  Champion Decl. Ex. 30 (Kindness Tr. 170:19-171:17).  When those stores stock the Nutrisystem products on their shelves they place them next to, or in the same aisle as, vitamin and dietary supplement products.  *See* B. Cole Decl. ¶ 9 Ex. G.  Similarly, online retailers such as Amazon group both parties' products in the same department (*e.g.* "Health & Household: Vitamins and Dietary Supplements"):



- 14 -

Champion Decl. Ex. 1.  As a result, consumers are likely to associate the products with one another and would not be surprised to see probiotic shakes and vitamins from the same source.

Accordingly, given the clear relationship between probiotic shakes and vitamins, this Court should find that the parties' products are closely related and that this factor weighs in favor of a likelihood of confusion.

### 3.   The Parties' Marks Are Identical

Similarity of the marks is "a critical question in the likelihood-of-confusion analysis."  *GoTo.com v. Walk Disney Company*, 202 F.3d 1199, 1205 (9th Cir. 2000).  "[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion."  *See id*. at 1206.  Here, Nutrisystem not only used the words "Fresh Start" as a trademark for its shakes; it also displayed those words on its packaging in a font and style that mimicked Fresh Start's product packaging:



| Fresh Start | Nutrisystem |
|---|---|
| B. Cole Decl. Ex. A | Champion Decl. Ex. 42 |

| Fresh Start |
|---|
| B. Cole Decl. Ex. A |

- 15 -

| Nutrisystem |
| --- |
|  |
| Champion Decl. Ex. 42 |

Where the two marks are virtually identical, courts have held that likelihood of confusion is "inevitable." *See e.g. Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[L]ikelihood of confusion is inevitable, when as in this case, the identical mark is used concurrently by unrelated entities); *Brookfield*, 174 F.3d at 1056 ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course").

Moreover, Fresh Start's registration for the FRESH START mark is a "standard character" mark. *See* Champion Decl. Ex. 4; TMEP § 807.03(i).  As a result, Fresh Start's exclusive right to use the mark "extremely broad." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014) ("Standard character registrations are federal mark registrations that make no claim to any particular font style, color, or size of display.") (citation and internal quotation marks omitted).  Thus, Fresh Start's registration covers all design variations of those words when in connection with dietary supplements, including Nutrisystem's design that appears on the FRESH START Shakes.  *Id.*

Accordingly, there can be no genuine dispute that this *Sleekcraft* factor also weighs in favor of likelihood of confusion.

### 4.    There is Evidence of Actual Forward Confusion

The fourth *Sleekcraft* factor is actual confusion.  Evidence of actual confusion constitutes "persuasive proof that future confusion is likely." *Kendall-Jackson*, 150 F.3d at 1048 (citation omitted).  Evidence of actual confusion comes

- 16 -

in two forms: survey evidence and testimony of confused consumers. *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir.2002). Here, Fresh Start has both.

### a.   Incidents of Customer Confusion

Evidence of actual confusion is not necessary to show a likelihood of confusion. *Perfumebay.com v. eBay, Inc.*, 506 F.3d 1165, 1176 (9th Cir. 2007). Such evidence is notoriously difficult to come by, particularly where, the goods are relativity inexpensive items such as food products. *General Mills, Inc. v. Fage Dairy Processing Industry S.A.*, 100 U.S.P.Q.2d 1584, 1604 (T.T.A.B. 2011). "Persons who are truly confused will often never be aware of the deception. Others who were confused and later learned of their deception will often not bother to report the fact." *McCarthy* § 23:12; *General Mills*, 100 U.S.P.Q.2d at 1604 ("confusion about sponsorship or affiliation would not necessarily be brought to the attention of either [party]"). Despite these difficulties, Fresh Start has evidence that its customers were confused by Nutrisystem's use of the FRESH START mark.

Following Nutrisystem's launch of its Fresh Start shakes in December 2018, Fresh Start began receiving phone calls from customers who mistakenly believed there was a connection between Nutrisystem and Fresh Start. Champion Decl. Ex. 3 (Cindy Tr. 158:16-159:8), Ex. 20 (Bob Tr. 214:22-216:11). For example, in early 2019, Christian Hauter called Fresh Start after seeing Nutrisystem's commercials for Nutrisystem's Fresh Start shakes. *Id*. Ex. 3 (Cindy Tr. 158:16-159:8). Mr. Hauter testified that, after seeing the commercial, he immediately thought there was some sort of sponsorship or affiliation between the two companies:

///

///

///

- 17 -

And I kept seeing this ad, you know, the usual ad. I think Marie Osmond was in it. And it said -- you have FreshStart shakes. And I saw that and I thought, well -- my immediate thought was *maybe they teamed up* with Bob or Bob *got bought out*.

*Id*. Ex. 19 (Hauter Tr. 63:24-65:17).

A few months later, another customer called Fresh Start and spoke to CEO Bob Cole.  Ex. 20 (Bob Tr. 214:22-216:11).  The customer said that he had seen one of Fresh Start's commercials on television.  *Id*.  Because Fresh Start had not aired any commercials, the customer had seen one of Nutrisystem's advertisements and mistakenly believed that Nutrisystem's Probiotic Shake was one of Fresh Start's products.  B. Cole. Decl. ¶ 8.

These incidents are sufficient to support a finding of likelihood confusion. *See e.g.*, *Conversive*, 433 F. Supp. 2d at 1092 (granting summary judgment on likelihood of confusion where Plaintiff identified two instances of actual confusion); *Wells Fargo & Company v. Wells Fargo Construction Co.*, 619 F. Supp. 710, 712 (D. Ariz. 1985) (two incidents of actual confusion demonstrated "[p]roof of likelihood of confusion").

### b.    Survey Evidence of Actual Confusion

Courts routinely rely on surveys to determine whether actual confusion exists.  *See e.g.*, *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1265 (9th Cir. 2001) (relying on survey evidence to demonstrate actual confusion); *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1179 (C.D. Cal. Sept. 30, 2010).  Here, Fresh Start's expert Brian Sowers conducted a survey to assess whether confusion was likely between the parties' products. Sowers Decl. ¶ 4, Ex. B.  In the survey, customers likely to purchase dietary supplements in the next six months were shown images of Amazon webpages featuring different dietary supplement products, including Fresh Start's FRESH START Daily Vitamin Pack and Nutrisystem's Probiotic Shake Mix.  *Id*. ¶¶ 5-7, 9.  The survey asked a series of questions to assess the likelihood of confusion,

including, for example, whether the consumer believed that the company that made the Nutrisystem FRESH START Probiotic Shake Mix had any business connection, affiliation, or association with the company that made the FRESH START Daily Vitamin Pack. *Id*. ¶¶ 11-13. Based on the results of the survey, Mr. Sowers found a 15.4% net level of confusion between the products. *Id*. ¶¶ 14-15. Courts have found that similar rates of confusion support a finding of likelihood confusion, especially where, as here, the market consists of a large number of consumers. *See Humble Oil & Ref. Co. v. Am. Oil Co.*, 405 F.2d 803, 817 (8th Cir. 1969) (11% of a national market of millions of consumers is a "large number" of confused persons); *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 279 (7th Cir. 1976) (15% of "the entire restaurant-going community" cannot be dismissed as "small").

### 5.    The Parties' Goods Travel Through the Same Channels

The fifth *Sleekcraft* factor examines the parties' marketing channels. Where the parties sell similar goods in identical marketing channels, there is a higher likelihood that consumers will be confused. *See Pom Wonderful*, 775 F. 3d at 1130-1131 (marketing channel factor weighed in favor of trademark owner, where both parties sold pomegranate beverages in supermarkets).

Here, both parties sell their products online and through brick-and-mortar retail locations. Although Fresh Start sells its products primarily through distributors, these distributors sell to retail stores around the country, including convenience stores, health food stores, and supermarkets. B. Cole Decl. ¶ 4, Ex. B; Champion Decl. Ex. 2 (Jonathan Tr. 160:16-161:1; 163:22-164:5). Nutrisystem uses similar channels, selling its products through Walmart, grocery store chains, ███████████████████. *Id*. Ex. 8 (Butt Tr. 197:15-199:21). Both parties also sell their products online through Amazon and Walmart.com. *Id*. Ex. 2 (Jonathan Tr. 160:4-8); Ex. 8 (Butt Tr. 195:22-197:4). Indeed, searches for "FRESH START" on Amazon return both parties' products:

Champion Decl. Ex. 1.

Finally, both parties rely on social media and websites to promote their products to consumers. *See id.* Ex. 3 (Cindy Tr. at 122:24-123:5); Exs. 14, 15, 43. Courts have "consistently recognized" that online marketing and advertising "exacerbate[es] the likelihood of confusion." *Brookfield*, 174 F.3d at 1057. Thus, this Court should conclude that this factor also weighs in favor of likelihood of confusion.

### 6. The Parties' Goods Are Relatively Inexpensive and Purchased Without Great Care

The sixth *Sleekcraft* factor examines the degree of purchaser care. "When dealing with inexpensive products, consumers are likely to exercise less care, thus making confusion more likely." *Discovery Communications, Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282, 1290 (C.D. Cal. 2001).

Here, Fresh Start's daily vitamin packets retail from $12.45-$27.45 for a 15-day supply. B. Cole Decl. ¶ 10. A 14-day supply of Nutrisystem's FRESH START Shakes similarly retails from ███████. Champion Decl. Exs. 44, 45. Courts have previously concluded that similarly price goods qualify as "relatively inexpensive" for the purposes of assessing purchaser care. *Power Balance LLC v. Power Force LLC*, Case No. SACV 10-1726 AG (MLGx), 2010

WL 5174957, at *6 (C.D. Cal. Dec. 14, 2010) (wristbands costing approximately $30 are "likely to be impulse purchases without much customer care and analysis"); *MEGAComfort, Inc. v. Impacto Protective Prod., Inc.*, No. SACV 13-952-JLS-AJWX, 2013 WL 12119557, at *7 (C.D. Cal. Nov. 14, 2013) (parties' shoe insoles considered "relatively inexpensive" suggesting purchasers may exercise a relatively low degree of care).[3]

Confusion is also more likely when the products at issue are sold in "busy grocery stores to hurried shoppers." *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir. 1986). Supermarket shoppers tend to select items "quickly and without careful examination." *Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir. 1983); *Ruiz Food Products, Inc. v. Camino Real Foods, Inc.*, Case No. 1:09-CV-1732 AWI SMS, 2009 WL 3642777, at *4 (E.D. Cal. Oct. 30, 2009) ("the court assumes as a default a supermarket shopper who makes purchasing decisions quickly but is nevertheless familiar with his/her brand and seeks it out").

Here, Nutrisystem's FRESH START shakes and Fresh Start's products are both sold in grocery stores and supermarkets, where the degree of care is diminished. The parties' goods also appear in similar but not identical stores. For example, Nutrisystem's products appear in larger chain grocery stores, whereas Fresh Start's products appear in health food stores and smaller independent supermarkets. Champion Decl. Ex. 2 (Jonathan Tr. 160:16-161:1; 163:22-164:5); Ex. 8 (Butt Tr. 197:15-199:21); Ex. 30 (Kindness Tr. 170:19-171:17); Ex. 47 (Schossberger Tr. 32:2-12). This tends to enhance confusion since customers do not have the opportunity to compare the products at the point of sale and, instead, rely on memory to distinguish between the marks. *La. World Exposition, Inc. v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984) ("The fact that the

---

[3] Internet searches for these parties' products show price ranges of $20.35-$52.63 (Impacto) and $22.07-$38.49 (MEGAComfort). Champion Decl. Ex. 46.

same exact stores do not carry both parties' merchandise enhances the likelihood of confusion").

### 7.   Nutrisystem Knew of Fresh Start's FRESH START Mark Before Adopting it for the FRESH START Shakes

Demonstrating bad faith intent is not necessary to find a likelihood of confusion. *GoTo.com*, 202 F.3d at 1208.  However, "[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Brookfield*, 174 F.3d at 1059; *see also Conversive*, 433 F. Supp. 2d at 1093.  Here, the evidence shows that Nutrisystem had knowledge of Fresh Start's trademark at the time Nutrisystem adopted the mark.  Champion Decl. Exs. 11, 12; Dkt. 47.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████  Champion Decl. Exs. 11-12.  Despite knowledge of Fresh Start's registration, Nutrisystem adopted the FRESH START mark, not only for its meal plan program, but also for shakes and meal kit products.  *Id*. Exs. 9, 10, 13.  As a result, any doubt on the issue of likelihood of confusion should be resolved against Nutrisystem.  *See Carl Karcher Enterprises Inc. v. Stars Restaurants Corp.*, 35 U.S.P.Q.2d 1125 at *10 (T.T.A.B. 1995).

In defense of its infringing conduct, Nutrisystem now claims it adopted the FRESH START mark in "good faith" based on other third party uses of similar marks.  Champion Decl. Ex. 48 (Supplemental Response to Interrogatory No. 10).  But good faith or lack of intent is not a defense.  *See Official Airline Guides*, *Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993).  When consumers are confused, no amount of good faith can make them less so.  *Fuji Photo Film Co. v. Shinohara Shoji*, 754 F.2d 591, 596 (5th Cir. 1985).  Nutrisystem also has no evidence to substantiate its claim that it acted in "good faith."  ██████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████.  Champion
Decl. Ex. 30 (Kindness Tr. 265:14-267:9); Ex. 49 (Krausz Tr. 29:11-31:4).
Moreover, Nutrisystem has declined to disclose the substance of any legal advice
it may have received.  *See e.g.* Dkt. No. 34; Champion Decl. Ex. 49 (Krausz Tr.
29:11-31:4).  *Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1012 (N.D.
Ill. Oct. 4, 1993) (ruling "defendants are precluded from relying on undisclosed
advice of counsel as part of their good faith argument in their motion for partial
summary judgment").

Based on these facts, it can be inferred that Nutrisystem at least has serious
concerns about Fresh Start's trademark rights.  *See Bank of Am. Nat'l Trust &
Savings Assc'n v. The First National Bank of Allentown*, 220 U.S.P.Q. 892 at *2
(T.T.A.B. 1984) (inferring that applicant was not only aware of opposer's
registration but must have had concerns about adopting opposer's trademark
when applicant's employees had no recollection of discussing search report that
identified opposer's registration as "the most pertinent reference").  Indeed,
Nutrisystem refused to produce ████████████████████ during discovery.
Nutrisystem produced copies only after Fresh Start filed a motion to compel and
Magistrate Judge Charles F. Eick ordered their production.  Dkt. Nos. 34, 44.

Accordingly, the court should find that this factor also weighs in favor of
likelihood of confusion.

## 8.   Likelihood of Expansion

The final *Sleekcraft* factor is the likelihood that the parties will expand their
product offerings so that they are selling overlapping goods.  To determine the
likelihood of expansion, courts inquire "whether the parties are likely to compete
with a similar product in the same market."  *Official Airline Guides*, 6 F.3d at
1394.  Here, competition is already occurring.  As discussed above, both parties
sell dietary supplements and have sold them under the FRESH START mark.

██████████████████████████████████████

1

2

3

4

5

6

7      Accordingly, this factor too weighs in favor of likelihood of confusion.

8   **C.   <u>Fresh Start is Entitled to Summary Judgment on its Unfair</u>**
         **<u>Competition and Common Law Trademark Infringement Claims</u>**
9

10      Because summary judgment of trademark infringement and false

11  designation of origin is appropriate, Fresh Start is also entitled to summary

12  judgment on its claims for unfair competition under California Business &

13  Professions Code § 17200 and under California common law. *See Conversive*,

14  433 F. Supp. 2d at 1093-94 (granting summary judgment of false designation of

15  origin, California state law unfair competition, and California common law unfair

16  competition because summary judgment was proper as to trademark infringement

17  claims, where the elements of the claims are based on likelihood of confusion).

18                    **V.   <u>CONCLUSION</u>**

19      For the foregoing reasons, Fresh Start respectfully requests that the Court

20  grant summary judgment in favor of Fresh Start on its trademark infringement,

21  false designation of origin, and unfair competition claims against Nutrisystem,

22  relating to the Nutrisystem FRESH START shakes.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: February 1, 2021

By: Jason A. Champion
        Michael K. Friedland
        Lauren Keller Katzenellenbogen
        Jason A. Champion

Attorneys for Plaintiff
Pacific Packaging Concepts, Inc.

34244053