# EXHIBIT 3

# REBUTTAL EXPERT REPORT OF HAL PORET IN MATTER OF PACIFIC PACKAGING CONCEPTS, INC. V. NUTRISYSTEM, INC. ET AL.

## ********************************

# RESPONSE TO SOWERS SURVEY AND REPORT

PREPARED BY:

Hal Poret

142 Hunter Ave

Sleepy Hollow, NY 10591

October 2020

## *BACKGROUND AND PURPOSE*

Counsel for Nutrisystem previously retained me to design and conduct surveys to test the extent to which, if at all, the Nutrisystem use of FreshStart creates a likelihood of forward confusion or reverse confusion with respect to Plaintiff's Fresh Start mark or products. As discussed in my opening Expert Report, the surveys showed no forward confusion or reverse confusion. I have now been asked to review and provide my opinions regarding the Expert Report of Brian Sowers, which discloses a survey conducted by Mr. Sowers that purports to find a likelihood of confusion, as well as criticisms of my survey.

Mr. Sowers designed his survey entirely based on Plaintiff's choice to identically characterize both parties' products in its Complaint as "dietary supplements." Rather than objectively considering the actual nature of the parties' products, what consumers purchase them for, and how they are sold, Mr. Sowers simply accepted Plaintiff's choice to identify both as "dietary supplements" in its Complaint as his justification to define the universe in an overbroad and inappropriate manner (purchasers of any "dietary supplement") and to select a survey methodology that presents the parties' products in close proximity, which bears no resemblance to realistic marketplace conditions. Mr. Sowers' criticisms of my survey are similarly premised on his acceptance of his client's choice to label both parties' products as "dietary supplements" and his failure to acknowledge the substantial differences between a product marketed as part of a weight loss/diet program versus packets of vitamins/minerals from a vitamin company.

Mr. Sowers' survey compounds these fundamental problems in several other ways, including: (1) using an Amazon.com ad to show the allegedly infringing Nutrisystem product, despite the fact that Defendant does not even sell the

FreshStart product on Amazon and the appearance of this particular ad from an unauthorized reseller is an aberration that does not reflect the manner in which the product at issue is almost always encountered when sold by Defendant; (2) using an improper control term that assumes that Plaintiff not only owns the mark Fresh Start but also owns the terms "Fresh" and "Start" individually; and (3) using an improper selection of third-party products in the lineup.

Even with all of these flaws, the survey showed that the supposed rate of confusing the Nutrisystem product with Plaintiff only exceeded the rate of "confusion" for third-party products whose names (Youngevity and UB) lack even a superficial commonality with Plaintiff by only 10%.[1]

In connection with preparing this report, I reviewed the materials cited in my opening Expert Report, and the Sowers Report and Appendices.  For my continuing work on this matter, I am being compensated at my ordinary hourly rate of $725.  My fees are not contingent on the nature of my opinions or the outcome of the proceeding.  My qualifications are detailed in my opening Expert Report and an updated copy of my CV is included here as Appendix A.

---

[1] It is my understanding that Nutrisystem has requested that Plaintiff provide the raw data from the Sowers Survey in its original electronic form and has not received it.  If I subsequently receive the raw data in electronic form that makes further analysis feasible, I reserve the right to supplement these opinions.

**Poret Declaration, Exhibit 3**
**Page 256**

## *OPINIONS REGARDING SOWERS SURVEY AND REPORT*

### I.   **Survey Universe**

The Sowers survey defines the relevant universe for forward confusion (prospective purchasers of Defendant's product) as individuals who are likely to purchase: "Dietary supplements (e.g., tablets, powder)."[2]  Accordingly, the Sowers survey universe consisted of any individual who purchases <u>any type of dietary supplement</u>, regardless of how irrelevant or far afield it is from the type of Nutrisystem product at issue in this case.  Mr. Sowers' sole justification for defining the universe in this manner is the following:

> "The complaint refers to Defendant's product as a dietary supplement."[3]

In other words, Mr. Sowers' entire basis for his survey population is the fact that Plaintiff chose in its Complaint to characterize the Nutrisystem product as a "dietary supplement."  This definition is baseless and unjustifiable, as it ignores the nature of the Nutrisystem product and the reality of the marketplace.  Nutrisystem explicitly presents itself as a <u>weight loss</u> company.  A Google search for Nutrisystem brings up a sponsored ad that leads with "Lose up to 18 lbs and 10 inches overall" and further states "Lose Weight, Money-Back Guarantee," as shown in the following example:

**Ad** · www.nutrisystem.com/ ▾

Nutrísystem Official Site - Shop Now & Get 50% Off

Lose Up to 18lbs And 10 Inches Overall In Your First 2 Months, Plus Free Home Delivery. Lose Weight, Money-Back Guarantee.Order Online and Have Meals Delivered to Your Door.

Men's Plans · Shop A La Carte · Choose Your 4-Week Plan · View Menu · How It Works

---

[2] Sowers Report Paragraph 83.
[3] Sowers Report Paragraph 32.

The Nutrisystem website home page advertises "lose weight fast" and immediately provides a "weight loss calculator" and an option for searching for a "weight loss plan":

## Nutrisystem®

## Enter your height & weight
to find a weight loss plan for you.

Height: [____] ft. [____] in.   Weight: [____] lbs.

**FIND MY PLAN ▶**

The Nutrisystem FreshStart products at issue are explicitly promoted as part of Nutrisystem weight loss plans, and include statements such as:

- Jumpstart your weight loss
- Bust belly bloat
- Reduce body fat

In sum, there is no doubt that the Nutrisystem FreshStart products at issue are marketed as weight loss products from a well-known weight loss company, and the context in which they are purchased is among individuals who are looking for products relating to weight loss.

Poret Declaration, Exhibit 3
Page 258

Defining the universe so vaguely as any purchaser of any "dietary supplement" entirely ignores this specific reality of the products at issue and the market for the products and leads to a survey population that is so severely overbroad as to be entirely improper and unreliable.  Equally problematic is the fact that the Nutrisystem products at issue are <u>not</u> even marketed or labelled as dietary supplements at all.

Since the Sowers Survey universe is defined so broadly (dietary supplements), there is no way to tell whether any respondents in the Sowers Survey are prospective purchasers of products aimed at weight loss.  By Mr. Sowers' own admission, the category of "dietary supplements" includes a wide variety of different types of products, including products that have no connection to weight loss, such as glucosamine (which is marketed as supporting joint health).[4] Respondents who have no interest in any weight loss products would have been included in the Sowers Survey of the Nutrisystem product as long as they purchase any type of dietary supplement.  This means, for example, that people who do not purchase weight loss products, but purchase "dietary supplements" marketed as sleep aids, joint health supplements, or menstrual support supplements would be included in the Sowers Survey:

---

[4] Sowers Report Paragraph 33.



All of these and countless other products that are far afield from the weight loss category are marketed and labeled as dietary supplements.

In fact, the Sowers Survey was just as likely to include individuals who are looking to <u>gain weight</u> as opposed to lose weight, as many weight gain products fall into the "dietary supplement" category, for example:





In sum, defining the survey universe based on the overbroad category of "dietary supplements" deprives the survey of any reliability, as it leaves us with no idea whether any respondent who was questioned about the Nutrisystem product is actually in the market for such weight loss products, and includes in the survey purchasers of countless "dietary supplements" that have no connection or relevance to the relevant category (weight loss).

Mr. Sowers' criticism of my own forward confusion survey universe (consumers of weight loss products/services) is meritless for the same reasons. It was entirely appropriate and necessary to focus the survey of the Nutrisystem product on consumers who have an interest in that type of product, and not to survey those who purchase any arbitrary dietary supplement such as glucosamine or sleep aids or even contradictory products like weight gain products.[5] By claiming that it was improper to limit the universe to purchasers of products relating to weight loss/diet programs and that the definition should have been "dietary supplements" broadly, Mr. Sowers is necessarily saying that the survey should have included consumers who are <u>not</u> in the market for weight loss products but are purchasers of a wide variety of completely irrelevant products.

The same is true of Mr. Sowers' criticism of my reverse confusion survey universe (purchasers of vitamin/mineral supplements). Again, Mr. Sowers claims that the proper universe for reverse confusion would be purchasers of any dietary supplement, basing this on a statement in Plaintiff's Complaint:

---

[5] Mr. Sowers' criticism also ignores the fact that 174 respondents in my forward confusion survey were purchasers of vitamin/mineral supplements.

> "In the complaint, Plaintiff defines their own product as a dietary
> supplement."[6]

Again, this simply ignores the reality of Plaintiff and its products, which are
vitamins/mineral packets. Plaintiff literally calls itself the FreshStart ***Vitamin***
Company (emphasis added). Its website is called freshstartvitamins.com and is
headlined by the statement "World's Best Selling Daily Packet Vitamin
Formulas." Google search results for Plaintiff use the headline "Fresh Start
Vitamins:

🍃 freshstartvitamins.com ▾

### Fresh Start Vitamins

Each formula contains a full spectrum of nutrients designed to promote OPTIMAL HEALTH and
WELL-BEING. We are confident that you will find our **Vitamin** ...
Packet Formulas · Price List · Fresh Start · Super Start

Its core products are packets of vitamins and minerals:

---

[6] Sowers Report Paragraph 35.



Plaintiff's products simply are vitamin/mineral packets.  To study consumer response to Plaintiff's products, it was entirely appropriate to survey purchasers of <u>vitamin/mineral supplements</u>, and would have been improper and irrelevant to survey those who do not purchase vitamin/mineral supplements, but rather purchase any number of unrelated or irrelevant products that are labelled "dietary supplements."

## II.   <u>Demand Effects</u>

The Sowers Report contains a section criticizing my forward confusion survey for introducing the Nutrisystem product as part of a weight loss/diet program and my reverse confusion survey for introducing Plaintiff's product as a

Poret Declaration, Exhibit 3
Page 263

vitamin/mineral supplement, rather than using the term "dietary supplement" for each product.[7] Mr. Sowers opines that this language primes respondents to think about the Nutrisystem product "only in in the context of weight loss products and not as dietary supplements as alleged in the complaint"[8] and to think about Plaintiff's products in the context of vitamin/mineral supplements. In his own survey, Mr. Sowers repeatedly introduces both the Nutrisystem product and Plaintiff's product identically as a "dietary supplement."

Mr. Sowers is correct that the manner in which the products are introduced provides a frame of reference that can create a "demand effect" and influence respondents' answers.  However, it is clearly the Sowers Survey that improperly introduced the products, creating an impermissible demand effect.  A survey should provide respondents with a context that simulates the mindset of a consumer who is considering the products under real marketplace conditions. Since Nutrisystem is a weight loss company and the Nutrisystem product at issue is clearly marketed as part of a weight loss program to those who are interested in weight loss, introducing the Nutrisystem product in the context of weight loss programs is true to marketplace reality, and simulates the conditions under which actual consumers would be considering the product.  Likewise, since Plaintiff's products are vitamin/mineral supplements, introducing Plaintiff's product as such is true to marketplace reality, and simulates the conditions under which actual consumers would be considering Plaintiff's product.

The Sowers Survey, on the other hand, misleadingly primes respondents to think of both parties' products as identical by repeatedly referring to both as "dietary supplements."  When each product is introduced, respondents are asked to

---

[7] Sowers Report Paragraph 39-44
[8] Sowers Report Paragraph 42

**Poret Declaration, Exhibit 3**
**Page 264**

consider them in the context of "dietary supplements."  In addition, each question repeatedly refers to both products as "dietary supplements" both in the question wording and in the answer choices, as shown in the following example:



The continuous repetition of "dietary supplement" to refer to both products bears no resemblance to how real consumers would think of the products under realistic marketplace conditions, and improperly primes respondents to consider the products to be alike.  As Mr. Sowers indicates, this generates an improper demand effect that undermines the reliability of the results.  Once again, the unquestioning adoption of Plaintiff's choice in its Complaint to characterize each party's product as a "dietary supplement" leads to an improper and unrealistic survey design.

### III.   Squirt Survey Methodology

Mr. Sowers also relies on the Complaint's identical characterization of both products as "dietary supplements" to improperly utilize a Squirt methodology, in which both parties' products are presented in quick succession and in which respondents are directly asked about a potential connection between the parties. As explained in my opening Expert Report and as Mr. Sowers concedes, the Squirt methodology is only appropriate for products that are the same type of product and directly competing, or substantially overlapping in the market.  If

products are not encountered in the marketplace in close proximity, the Squirt Survey creates an artificial marketplace with unreliable results.[9]  Again, Mr. Sowers' sole basis for his methodology is the Complaint's labelling of both products as part of an extremely broad "dietary supplement" category.  Even if it were accurate to place both parties' products into this broad category (which it is not since the Nutrisystem product is not marketed or labeled as a dietary supplement), this would be far from sufficient justification to consider the parties products to be competing or overlapping in the marketplace.  Glucosamine supplements for joint support and sleep aids are not competing or overlapping in the marketplace just because they are "dietary supplements," any more than tomato sauce and chocolate bars are overlapping because they are both "food." Here, the products at issue are packets of vitamin/mineral tablets or capsules, on the one hand, and a weight loss powdered shake mix on the other.  They are sold through almost entirely separate channels of trade and for distinct purposes. There is insufficient marketplace overlap to base a survey on the premise that a typical consumer who is considering purchase of the Nutrisystem weight loss product would also simultaneously encounter and consider Plaintiff's vitamin/mineral products.  Mr. Sowers' presentation of both products in quick succession using the Squirt format fails to simulate the marketplace conditions under which consumers of either parties' product would encounter and consider the product, leading to purely arbitrary and unreliable results.[10]

Beyond relying on the Complaint's characterization of both products identically as "dietary supplements," Mr. Sowers' also claims that the products are

---

[9] Jerre Swann, *Eveready and Squirt – Cognitively Updated*, 106 TMR 727 at 743 (2016).
[10] For these same reason, Mr. Sowers' criticism of my survey for failing to use the Squirt format is meritless.  Mr. Sowers opines that I "arbitrarily redefined" the products as weight loss products and vitamin/mineral supplements without empirical evidence that they are distinct products.  To the contrary, the empirical evidence is the products themselves and the companies' own marketing materials.  The products simply are distinct types of products marketed for distinct purposes.

overlapping due to data from my own survey showing that most of the respondents who purchase weight loss products also purchase vitamins/minerals. This misunderstands what it means for products to be overlapping in the marketplace. The mere fact that the same consumer purchases multiple products does not make those products overlapping in any meaningful sense. Most people who purchase automobiles also purchase toothpaste. Most people who purchase power tools also purchase toilet paper. This does not make these pairs of products overlapping in the sense that consumers in the real world encounter and consider the products in close proximity, and does not make it appropriate to ask consumers to do so in a survey. Likewise, the fact that many consumers of weight loss products also purchase vitamins/minerals does not make those products proximate. What matters is that they are meaningfully distinct products for different purposes and which are sold in distinct channels.

Mr. Sowers' final purported justification for the Squirt format is that the products are supposedly sold side-by-side on Amazon.com. This is completely meritless for multiple reasons. Most importantly, and as discussed in the next section in more detail, Nutrisystem does not sell its FreshStart product on Amazon at all. Any appearance of a Nutrisystem FreshStart product on Amazon is an outlier that is attributable to an unauthorized reseller. In addition, even in the limited instance of a resold product, the Nutrisystem and Plaintiff products are not sold "side-by-side" on Amazon.com. They are simply two of countless types of products that are sold on Amazon. If the mere presence of two products on Amazon were sufficient to justify a Squirt design, this would entirely eviscerate the proximity requirement, as most types of products are available on Amazon.

IV.    **Sowers Survey's use of an Amazon.com ad to represent the**
**Nutrisystem product fails to replicate marketplace conditions**.

As Mr. Sowers concedes, a confusion survey should reasonably replicate the
marketplace conditions under which the allegedly infringing product is
encountered.[11]   The Sowers Survey failed to do so in the most egregious manner.
By far the most frequent way that the Nutrisystem FreshStart products are
encountered are <u>directly through Nutrisystem</u>.   The products at issue were
heavily offered through Nutrisystem's own website and call center, meaning that
there was heavy focus on the Nutrisystem brand and the context of weight
loss/diet programs.   Nutrisystem's FreshStart products have also been promoted
through the QVC and Home Shopping Network (HSN).   Nutrisystem has <u>not</u>
sold its FreshStart products through Amazon.com at all.   If any Nutrisystem
FreshStart product has been sold on Amazon, this is an outlier that is attributable
to an unauthorized reseller and does not at all reflect typical marketplace
conditions under which the Nutrisystem FreshStart products are sold.   Mr.
Sowers' decision to premise his entire likelihood of confusion analysis on an
aberration whereby one of Defendant's products ended up being resold on
Amazon is unjustifiable, as it does not at all reflect the marketplace conditions
under which virtually all of the allegedly infringing products are encountered
and purchased.

Mr. Sowers criticizes my survey for supposedly failing to replicate marketplace
conditions.   The basis for this criticism is that I allowed respondents to see all
sides of the Nutrisystem FreshStart product at issue, as Mr. Sowers claims this
forced respondents to pay too much attention to the product.[12]   This is a meritless
criticism, as a survey should provide respondents with an adequate opportunity

---

[11] Sowers Report Paragraphs 53-54.
[12] Sowers Report Paragraph 63.

**Poret Declaration, Exhibit 3**
**Page 268**

to examine the product, even if various consumers in the real world spend more or less time doing so.  Having respondents spend 40 seconds reviewing the various facets of the product is reasonable and not at all inconsistent with realistic marketplace conditions.  More importantly, as noted in my opening Expert Report, showing more than the front of the Nutrisystem product was favorable to Plaintiff's allegations, as this showed a listing of all the vitamins and minerals that the Nutrisystem product contains.

## V.   Sowers Survey's Use of an Improper Control

The Sowers Survey analysis rests on the "net" confusion rate that is the product of comparing the Test and Control Group results.  A selection of a proper control is thus critical, particularly given that the use of a Squirt format in the context of different product types (vitamin/mineral supplements versus a weight loss product) is artificially suggestive.  A proper control would have made alterations to the Nutrisystem "FreshStart" mark that are sufficient to avoid an allegedly confusing similarity with Plaintiff's mark, but that do not change the mark any more than arguably necessary.

Here, Plaintiff makes no claim to ownership of the term "Fresh" on its own, nor could it, as the term "Fresh" is used by many companies, including in the area where Plaintiff claims rights (dietary supplements).  Even if Plaintiff could claim that Nutrisystem's use of "FreshStart" is infringing, Plaintiff would have no basis for claiming that Nutrisystem could not use the term "Fresh" at all.  Accordingly, a proper control could have retained the term "Fresh" but replaced the term "Start."  For instance, the control could have renamed the Nutrisystem product to be "FreshShake" or "FreshDiet" or "FreshLoss" or any number of other terms that use the term "Fresh" but could not be considered confusingly similar to Plaintiff's mark Fresh Start.  Any such control would have been more suitable to

measure the tendency of the Squirt format to lead respondents to search for superficial commonalities between the products (such as connecting two products merely because they both use the common and unprotectible term "Fresh"), and to weed out such "noise."

The Sowers Survey impermissibly altered the FreshStart mark far too much to be a legitimate control, as it eliminated both the terms Fresh and Start and arbitrarily replaced them with the term Turbo.  Contrary to Mr. Sowers' statement, "Turbo" is not a synonym for FreshStart, and "turbo" does not connote the same or similar meaning as "fresh."  The fact that Nutrisystem also uses "Turbo" on other products does not make it a proper control.  It is an arbitrary control that improperly eliminates the term "fresh" and is the equivalent of claiming that Plaintiff owns rights to "fresh" on its own and that Nutrisystem cannot use the term "fresh" in combination with any another term that bears no similarity to Plaintiff's mark.  The use of an improper control renders the net confusion result, and thus Mr. Sowers' conclusions, unreliable.

### VI.    Sowers Survey's Use of Biased Lineup

The use of an improper control was also compounded by the use of a biased lineup that also failed to include any third-party products that included the term "fresh."  As indicated above, Plaintiff does not claim rights to the term "Fresh" on its own and, in fact, numerous third parties use the term fresh in the context of dietary supplements.  Some examples are shown here:

**Poret Declaration, Exhibit 3**
**Page 270**



Roll over image to zoom in

Fresh Prime Plus Keto Pills Advanced Weight Loss Supplement FreshPrime Natural Ketogenic 800 mg Formula with Original GO BHB Salts Ketone Diet Capsules to Boost Metabolism, Energy and Focus

Brand: nutra4health LLC

Price: $19.95 ($0.33 / Count) & FREE Shipping

Get $125 off: Pay $0.00 upon approval for the Amazon Business Prime Card. Terms apply.

Returnable until Jan 31, 2021 ⌄

- THE HEALTHIER OPTION. Our Fresh Prime Plus Pills allow you to burn fat naturally through a metabolic stated known as ketosis. When you are in the state of ketosis, your body burns fatty acids instead of sugar or glucose. This means that your body does all the heavy lifting work to achieve weight loss by turning excess fat into

Poret Declaration, Exhibit 3
Page 271



Inclusion of any such products in the lineup would have reduced the suggestiveness of the lineup by not presenting the Nutrisystem product as the only "dietary supplement" in the lineup that shares the common term "fresh."

The Sowers Survey, however, constructed a lineup that first showed respondents Plaintiff's Fresh Start product and then showed them the following three products:

- Nutrisystem FreshStart
- Youngevity
- UB Super

This is a highly biased lineup, in that the Nutrisystem product is the only one that contains the superficial commonality that the term "fresh" is used.  This further undermines the Sowers Survey of any reliability.

### VII.    Sowers Survey Results

Even with all of the flaws discussed above, the supposed rate of "confusing" the Nutrisystem product with Plaintiff only exceeded the rates of confusing completely unobjectionable third-party products by a margin of roughly 10%.  The Sowers Survey also showed and asked respondents about the following two products:

 

As shown here, the Youngevity and UB Super products lack even the slightest trademark commonality with Plaintiff's Fresh Start mark.  Accordingly, the rates of answering that these products are from the same company as Plaintiff's

product (or an affiliated company) are the most extreme forms of noise.  And yet, as shown in Mr. Sowers' own analysis, the rate of confusing the Nutrisystem product only exceeded the rate of confusing these other products with Plaintiff by a margin of 10%:

- Nutrisystem FreshStart = 37.7%
- Youngevity = 27.2%
- UB Super = 27.4%

These rates for Youngevity and UB Super are even higher than the result for the control product (Turbo) and prove that the control did not sufficiently weed out survey noise.  The roughly 10% margins resulting from these non-similar third party products undermine the net 15.4% result that Mr. Sowers relies on, and shows that the rate of supposedly confusing the Nutrisystem product with Plaintiff is not much higher than the survey noise level, as demonstrated by the rate of supposed confusion with products that bear no trademark similarity at all.

### VIII.   Mr. Sowers' comments on the absence of a Control Group in my surveys

Even though it is clear that Control Groups would have served no purpose at all in my surveys given that the Test Groups showed no confusion, Mr. Sowers nevertheless attempts to portray the absence of Control Groups as a source of concern.  Mr. Sowers' criticism regarding the absence of Control Groups suggests a failure to understand the concepts he discusses (control, causation) that it is impossible to credit his criticism as genuine.  As Mr. Sowers indicates, a Control Group is akin to a placebo group in an experiment that is used to assess causation of an observed effect (such as improvement in pain symptoms).  For

**Poret Declaration, Exhibit 3**
**Page 274**

instance, if 50% of a Test Group reports that their headache felt better after taking a medication, this raises a question of <u>causation</u> – i.e., what <u>caused</u> the observed effect (headache improvement.)  Was it the active ingredient in the pill, or was it another factor, like a placebo effect or something leading about the survey questions?  The Control (or placebo) group answers this question by removing the active ingredient and seeing what percentage nevertheless answers that their headache improved.  Imagine the Control result is 20%.  This tells us that a placebo effect or flaws in the questions <u>caused</u> a 20% result.  Deducting this from the 50% test group result reveals that 30% of the observed effect (reporting of improved headache) in the Test Group must be <u>caused by</u> the pill.  On the other hand, if the Test Group had shown that 0% reported improvement from the pill, there is <u>no observed effect</u> for which a cause needs to be determined.  It is simply clear that the pill did <u>not</u> have an effect.  There would be no role for a Control Group.

The same is true of my surveys.  Since no confusion was observed in the Test Group, there is no observed effect for which a cause needs to be determined.  A Control Group would serve no purpose and play no role in the analysis, no matter what it showed.  Mr. Sowers insistence on the need for a Control Group when the Test Group result is 0% appears to hinge on the idea that a survey must analyze the cause of the <u>absence</u> of confusion.  This is an absurd notion, as the absence of something does not have a cause.  It is an absence, not an observed effect whose cause can be studied.  <u>Confusion</u> is an affirmative occurrence whose cause needs to be studied.  The absence of an occurrence does not have a cause to isolate.

Mr. Sowers of course does not explain how a control could have served any purpose in the present instance.  It is easy to see using his own choice of control for his survey how a Control Group could not possibly be needed or useful when

a Test Group result is 0%.  Imagine a Control Group had been shown the Nutrisystem product with the name Turbo instead of FreshStart.  Further imagine that 0% identified Plaintiff.  This would have had no impact on the results.  It would still be a Test Group of 0%, unadjusted by the Control Group result of 0%.  Or imagine the Control Group had shown a 10% result.  This still would have had no impact on the result or analysis.  A Test Group result of 0% with a Control Group result of 10% is still a net result of 0.  There is simply no outcome of a control group that could have had any impact.

Mr. Sowers' own analysis of his own Control further proves this point.  Mr. Sowers underlines subtracts his Control Group result from his Test Group result.  The Control Group only served a purpose because his Squirt design led to a Test Group result above zero.  With a zero Test Group result, on the other hand, subtracting a Control Group result serves no purpose.

## CONCLUSIONS

For the foregoing reasons, it is my opinion that the Sowers Survey is too severely flawed to be of any value, and that Mr. Sowers' criticisms of my surveys are meritless.

Hal Poret

Dated:  October 19, 2020